**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL 2724<br>16-MD-2724<br>HON. CYNTHIA M. RUFE |
| IN RE:  PROPRANOLOL CASES | |
| THIS DOCUMENT RELATES TO:<br><br>*ALL INDEPENDENT RESELLER PLAINTIFF (IRP) ACTIONS* | 16-PP-27243<br><br>Civil Action No. 17-cv-3822<br><br>**CLASS ACTION**<br>**JURY TRIAL DEMANDED** |

**Indirect Reseller Plaintiffs'**

**AMENDED CLASS ACTION COMPLAINT**

**FILED WITH REDACTIONS – PUBLIC VERSION**

## TABLE OF CONTENTS

**Page**

I.  NATURE OF THE ACTION ................................................................................. 1

II.  ONGOING FEDERAL AND STATE INVESTIGATIONS ............................... 4

III.  JURISDICTION AND VENUE .......................................................................... 8

IV.  PARTIES ........................................................................................................... 10

    A.  Plaintiffs ................................................................................................. 10

    B.  Defendants .............................................................................................. 11

        1.  Actavis Defendants ..................................................................... 11

        2.  Breckenridge ............................................................................... 12

        3.  Heritage ....................................................................................... 12

        4.  Mylan Defendants ....................................................................... 13

        5.  Par ................................................................................................ 13

        6.  Teva .............................................................................................. 14

        7.  Upsher-Smith .............................................................................. 14

V.  INTERSTATE AND INTRASTATE TRADE AND COMMERCE .............. 15

VI.  BACKGROUND OF THE GENERIC DRUG INDUSTRY ........................... 15

    A.  Generic drugs are commodity products that compete on price ............... 15

    B.  Pricing of generic drugs discourages unilateral price increases ............ 18

VII.  THE GENERIC PROPRANOLOL CONSPIRACY ...................................... 20

    A.  The generic Propranolol market ............................................................. 20

    B.  Generic Propranolol price increases ....................................................... 21

    C.  Extended release capsules ...................................................................... 23

    D.  Tablets .................................................................................................... 31

    E.  Defendants' Conspiracy ......................................................................... 39

-i-

**FILED WITH REDACTIONS – PUBLIC VERSION**

F.     Defendants' concerted efforts to increase prices for generic Propranolol yielded supracompetitive profits ................................................................ 53

G.     Factors increasing the market's susceptibility to collusion ............................... 54

    1.    Industry concentration ......................................................... 54

    2.    Barriers to entry ................................................................... 57

    3.    Demand inelasticity ............................................................. 58

    4.    Lack of substitutes ............................................................... 59

    5.    Standardized product with high degree of interchangeability ................ 60

    6.    Inter-competitor contacts and communications ........................................ 61

VIII.    THE STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS .......... 67

A.     The Statutes of Limitations did not begin to run because Plaintiffs did not and could not discover Defendants' unlawful conspiracy .................................... 67

B.     Fraudulent concealment tolled the Statutes of Limitations .................................. 69

    1.    Active concealment of the conspiracy ...................................... 70

    2.    Plaintiffs exercised reasonable diligence ................................. 72

IX.    CONTINUING VIOLATIONS ........................................................ 72

X.    DEFENDANTS' ANTITRUST VIOLATIONS ........................................... 73

XI.    CLASS ACTION ALLEGATIONS ................................................... 74

XII.    CAUSES OF ACTION ............................................................. 78

XIII.    PRAYER FOR RELIEF ........................................................... 124

XIV.    JURY DEMAND ................................................................. 126

**FILED WITH REDACTIONS – PUBLIC VERSION**

## I.   **NATURE OF THE ACTION**

1.     This suit brings claims on behalf of independent pharmacies ("Independent pharmacies," "Indirect Reseller Plaintiffs," or "Plaintiffs") for injunctive relief and to recoup overcharges that resulted from an unlawful agreement among Defendants to allocate customers, rig bids, and fix, raise and/or stabilize the prices of generic Propranolol.

2.     Propranolol[1] is used to treat tremors, angina (chest pain), hypertension (high blood pressure), heart rhythm disorders, and other heart or circulatory conditions.  It is also used to treat or prevent heart attacks, and to reduce the severity and frequency of migraine headaches. It is reportedly the highest-selling beta-blocker as measured by prescriptions.

3.     For years, competition among sellers of generic Propranolol kept prices stable, at low levels. But starting in March 2013 (for Propranolol capsules) and December 2014 (for Propranolol tablets), Defendants, who dominate the market for Propranolol, abruptly and inexplicably raised prices. The price increases were extreme and unprecedented:  prices for generic Propranolol caplets and tablets increased by as much as ████████████████.  Prices remain at elevated levels today.

4.     Defendants' unlawful and anticompetitive conduct in the Propranolol market is part of a larger conspiracy or series of conspiracies involving numerous generic pharmaceuticals and pharmaceutical manufacturers.

5.     The price increases imposed by Defendant manufacturers of generic Propranolol cannot be explained by supply shortages or any other market feature or shock. Nor were they the

---

[1] Unless specified otherwise, the term "Propranolol" as used herein refers to both Propranolol tablets and extended release (or "ER") capsules, but not any other formulations of Propranolol hydrochloride.

result of unilateral business decisions. Instead, the significant increases in the prices of Propranolol were the result of an illegal agreement among Defendants to fix prices.

6.     The market for generic Propranolol was highly conducive to collusion, as it was controlled almost exclusively by the Defendants and is subject to high barriers to entry, including substantial manufacturing costs and regulatory requirements. Because generic Propranolol is a medically necessary product for which reasonable substitutes are not available and demand is inelastic, Defendants were able to raise prices in concert without suffering corresponding losses in sales volume. Federal regulations require Defendants' generic Propranolol products to contain the same type and amount of active pharmaceutical ingredient and to be therapeutically equivalent to one another. They are therefore interchangeable commodity products. Interchangeability facilitates collusion, as cartel members can easily monitor and detect deviations from a price-fixing or market allocation agreement.

7.     Because purchasers choose whose generic Propranolol product to buy based primarily on price, and unilateral price increases generally result in loss of market share, it would have been economically irrational for any one Defendant to dramatically raise its prices without assurance that its competitors would do the same.

8.     Defendants' attendance at trade association meetings, conferences, and workshops provided ample opportunities to agree on generic Propranolol prices and allocate markets and customers for generic Propranolol. As alleged below, Defendants implemented their conspiracy through numerous secret meetings and communications, including trade association meetings held by the Generic Pharmaceutical Association (now the Association for Accessible Medicines) ("GPhA"), the National Association of Chain Drug Stores ("NACDS"), ██████████

**FILED WITH REDACTIONS – PUBLIC VERSION**

██████████████████████████████████

████████████████████████████

9.    Extreme and unprecedented price increases in the generic drug industry—like those imposed by manufacturers of Propranolol—have prompted close scrutiny of the industry by the U.S. Congress, federal and state enforcement agencies, and private litigants.

10.    An ongoing criminal investigation by the Antitrust Division of the U.S. Department of Justice ("DOJ") has, to date, resulted in price-fixing guilty pleas from two senior executives at Heritage Pharmaceuticals, Inc. relating to the sale of doxycycline hyclate and glyburide. But DOJ has made clear that its "investigation is ongoing"[2] and the evidence uncovered during the course of its investigation into those drugs also "implicates . . . a significant number of the Defendants . . . . [and] a significant number of the drugs at issue" in this Multidistrict Litigation.[3]

11.    In addition to the federal criminal investigation, after years of investigation and on the basis of millions of documents as well as witness testimony, the Attorneys General of at least forty-seven States have filed a complaint in this MDL alleging an overarching conspiracy among generic drug manufacturers to fix prices and allocate customers.  The States have made clear that they have "uncovered wide-ranging conduct implicating numerous different drugs and competitors"[4] and have stated in open court that complaints involving additional drugs and manufacturers will be filed in 2019.

---

[2] DOJ, *Division Update Spring 2017* (Mar. 28, 2017), *available at* https://www.justice.gov/atr/division-operations/division-update-spring-2017/division-secures-individual-and-corporate-guilty-pleas-collusion-industries-where-products.
[3] Intervenor United States' Motion to Stay Discovery at 1–2 (May 1, 2017), ECF No. 279.
[4] *State of Connecticut v. Aurobindo Pharma USA, Inc.*, No. 3:16-cv-2056 (VLB) (D. Conn.) (Doc. 168 at ¶ 9) (State AG Amended Complaint).

**FILED WITH REDACTIONS – PUBLIC VERSION**

12.     Manufacturers of generic Propranolol are implicated in these ongoing actions; at least five of the Defendants named here, including Actavis Holdco U.S., Inc., Heritage Pharmaceuticals, Inc., Mylan Inc., Par Pharmaceutical, Inc., and Teva Pharmaceuticals USA, Inc., have received a federal grand jury subpoena and/or an investigative demand from State AGs as part of the generic drug price-fixing investigations.

13.     Plaintiffs bring this action against Defendants on account of their past and ongoing violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and the state laws set forth below.  Plaintiffs bring this action both individually and on behalf of (a) a national injunctive class of privately-owned pharmacies in the United States and its territories that purchased generic Propranolol products manufactured by any Defendant, from March 2013 to the present (for Propranolol capsules) or December 2014 to the present (for Propranolol tablets) (the "Class Periods"), and (b) a Damages class of privately-owned pharmacies persons or entities in the states and territories identified herein that purchased generic Propranolol products manufactured by any Defendant, from March 2013 to the present (for Propranolol capsules) or December 2014 to the present (for Propranolol tablets).

## II.     ONGOING FEDERAL AND STATE INVESTIGATIONS

14.     On December 12 and 13, 2016, DOJ filed criminal charges against former Heritage executives Jeffrey Glazer (CEO) and Jason Malek (President). The government alleged that they conspired with others "to allocate customers, rig bids, and fix and maintain prices" of glyburide and doxycycline hyclate in violation of the Sherman Act (15 U.S.C. § 1).[5]

---

[5] Information ¶ 6, *United States v. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa. Dec. 12, 2016), ECF No. 1; Information ¶ 6, *United States v. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa. Dec. 13, 2016), ECF No. 1.

**FILED WITH REDACTIONS – PUBLIC VERSION**

15.     On January 9, 2017, Glazer and Malek pleaded guilty to those charges.[6] Deputy Assistant Attorney General Brent Snyder of the Justice Department's Antitrust Division explained: "These charges are an important step in correcting that injustice and in ensuring that generic pharmaceutical companies compete vigorously to provide these essential products at a price set by the market, not by collusion."[7] Glazer and Malek are cooperating with DOJ's continuing investigation. More criminal charges and guilty pleas are expected to follow.[8]

16.     Although initial public disclosures suggested that the federal and state investigations were focused on one or two drugs, it is now clear that both investigations are much, much broader. According to one report, prosecutors see the investigation of the generic drug industry much like DOJ's antitrust probe of the auto parts industry, which is DOJ's largest criminal antitrust probe ever. *See In re Automotive Parts Antitrust Litig.*, No. 2:12-md-02311 (E.D. Mich.). As in that case, prosecutors expect "to move from one drug to another in a similar cascading fashion."[9]

17.     DOJ and a federal grand jury empaneled in the Eastern District of Pennsylvania have focused on at least seventeen generic drug manufacturers as part of the growing investigation, including: Actavis Holdco U.S., Inc. ("Actavis"); Aurobindo Pharma USA, Inc. ("Aurobindo"); Citron Pharma LLC ("Citron"); Dr. Reddy's Laboratories, Inc. ("Dr. Reddy's"); Heritage

---

[6] *See* Tr. of Plea Hr'g, *United States v. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa. Jan. 9, 2017) (ECF No. 24); *see also* Tr. of Plea Hr'g, *United States v. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa. Jan. 9, 2017) (ECF No. 24).

[7] DOJ, Press Release (Dec. 14, 2016), *available at* https://www.justice.gov/opa/pr/former-top-generic-pharmaceutical-executives-charged-price-fixing-bid-rigging-and-customer.

[8] *See, e.g.*, Eric Kroh, *Generic Drug Price-Fixing Suits Just Tip Of The Iceberg*, Law360 (Jan. 6, 2017) ("'Once somebody starts cooperating, it leads to many more indictments.'"), *available at* https://www.law360.com/articles/877707/generic-drug-price-fixing-suits-just-tip-of-the-iceberg.

[9] *Id.*

Pharmaceuticals, Inc. ("Heritage"); Impax Laboratories, Inc. ("Impax"); Lannett Company, Inc. ("Lannett"); Mayne Pharma, Inc. ("Mayne"); Mylan Inc. ("Mylan"); Par Pharmaceuticals, Inc. ("Par"); Perrigo New York, Inc. ("Perrigo"); Sandoz, Inc. ("Sandoz"); Sun Pharmaceutical Industries, Inc. ("Sun"); Taro Pharmaceuticals USA, Inc. ("Taro"); Teva Pharmaceuticals USA, Inc. ("Teva"); and Zydus Pharmaceuticals USA, Inc. ("Zydus").

18.    The fact that these companies and/or their employees received subpoenas from a federal grand jury is significant. DOJ does not empanel grand juries lightly. The *Antitrust Division Manual* admonishes that "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution." Accordingly, before a grand jury investigation proceeds, it requires a series of approvals, first by the relevant field chief, who then sends the request to the Antitrust Criminal Enforcement Division. "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal Enforcement will make a recommendation to the Assistant Attorney General[,]" who must give final approval and authorize all attorneys who will participate in the investigation.[10]

19.    As Mark Rosman, former assistant chief of the National Criminal Enforcement Section of DOJ's Antitrust Division, noted in an article on the "unusual" nature of the criminal subpoenas, "A DOJ investigation into the alleged exchange of pricing information in the pharmaceutical industry likely indicates that the agency anticipates uncovering criminal antitrust conduct in the form of price-fixing or customer allocation."[11]

---

[10] DOJ, Antitrust Division Manual III–81–83 (5th ed. 2015), *available at* http://www.justice.gov/atr/public/divisionmanual/chapter3.pdf.

[11] Mark Rosman & Seth Silber, *DOJ's Investigation Into Generic Pharma Pricing Is Unusual*, Law360 (Nov. 12, 2014), *available at* https://www.wsgr.com/publications/PDFSearch/rosman-1114.pdf.

20.     Another significant indication of criminal price-fixing in the generic drug industry is that DOJ has received assistance from a privately-held company that came forward as a leniency applicant: "It is understood that Heritage is cooperating with prosecutors in exchange for amnesty from criminal prosecution under DOJ's leniency program[.]"[12]  As explained on DOJ's website, an applicant for amnesty "must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes, before it will receive a conditional leniency letter." The applicant must also establish that "[t]he confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials."[13]

21.     In addition to the federal criminal investigation, the Connecticut AG began an investigation in July 2014 into the dramatic price increases in generic drugs.  It has been joined by the Attorneys General of at least 47 other states and the District of Columbia, in filing a civil complaint in the U.S. District Court for the District of Connecticut alleging price-fixing and customer allocation.[14]  These States have declared in open court that they intend to file

22.     The State AG Complaint explains that the generic drug industry is structured in a way that facilitates these types of collusive communications.  "Generic drug manufacturers operate, through their respective senior leadership and marketing and sales executives, in a manner that fosters and promotes routine and direct interaction among their competitors."  This affords them opportunities to "exploit their interactions at various and frequent industry trade shows,

---

[12] Richard Vanderford, "Generic Pharma Investigation Still Broad, Prosecutor Says," mLex (Feb. 21, 2017).

[13] DOJ, *Frequently Asked Questions about the Antitrust Division's Leniency Program* (updated Jan. 26, 2017), *available a*t https://www.justice.gov/atr/page/file/926521/download.

[14] On August 3, 2017, the U.S. Judicial Panel on Multidistrict Litigation ("JPML") issued an order directing that the State AG case be transferred to this Court and coordinated as part of MDL 2724.  (ECF No. 417).

**FILED WITH REDACTIONS – PUBLIC VERSION**

customer conferences and other similar events, to develop relationships and sow the seeds for their illegal agreements."[15]

23.     The criminal informations and guilty pleas relating to Glazer and Malek, the grand jury subpoenas, and evidence divulged in the State AG Complaint are merely the tip of the iceberg. The government investigations have uncovered the existence of "a broad, well-coordinated and long-running series of schemes to fix the prices and allocate markets for a number of generic pharmaceuticals in the United States."[16]  Plaintiffs do not yet have access to all of the information available to the government enforcement agencies.   What is known is that in light of all the evidence described above, the large and unprecedented price increases for generic Propranolol cannot be explained by normal, competitive market forces.  The explanation is collusion.

24.     A separate action filed by Heritage against Glazer and Malek details a discussion between the two former executives about selling Propranolol at a "high price" in early 2015, which is when the extraordinary price increases for Propranolol tablets—the product which Heritage sells—began.[17]

### III.     JURISDICTION AND VENUE

25.     Plaintiffs bring Count One of this action under Section 16 of the Clayton Act (15 U.S.C. § 26) for injunctive relief and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs and the members of the Classes described herein by reason of the violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

---

[15] State AG Compl. ¶ 7.
[16] State AG Compl. ¶ 1.
[17] *See Heritage Pharm. Inc. v. Jeffrey A. Glazer & Jason T. Malek*, Case No. 16-cv-08483 (D.N.J. Nov. 11, 2016), app. A, n. 95.

**FILED WITH REDACTIONS – PUBLIC VERSION**

26.     This action is also instituted under the antitrust, consumer protection, and common laws of various states and territories for damages and equitable relief, as described in Counts Two through Four below.

27.     Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1337 and by Section 16 of the Clayton Act (15 U.S.C. § 26).  In addition, jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1332(d) and 1367.

28.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C §§ 1391(b)–(d); and 1407 and MDL Order dated April 6, 2017 (ECF No. 291), and because, during the Class Periods, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District.  Venue is also proper in this District because the federal grand jury investigating the pricing of generic drugs is empaneled here and therefore it is likely that acts in furtherance of the alleged conspiracy took place here.  According to DOJ guidelines, an "investigation should be conducted by a grand jury in a judicial district where venue lies for the offense, such as a district from or to which price-fixed sales were made or where conspiratorial communications occurred."[18]

29.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant:  (a) transacted business throughout the United States, including in this District; (b) sold Propranolol throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; (d) was engaged in an illegal scheme and nationwide price-fixing conspiracy that was directed at, had the intended effect of causing injury to, and did cause injury to persons residing in, located in, or doing business throughout the United

_____

[18] DOJ, Antitrust Division Manual at III-83.

**FILED WITH REDACTIONS – PUBLIC VERSION**

States, including in this District; and/or (e) took overt action in furtherance of the conspiracy in this District or conspired with someone who did, and by doing so could reasonably have expected to be sued in this District. In addition, nationwide personal jurisdiction was authorized by Congress pursuant to the Clayton Act and by 28 U.S.C. § 1407.

## IV.   <u>PARTIES</u>

### A.   **Plaintiffs**

30.     Plaintiff West Val Pharmacy ("West Val") is a privately held independent pharmacy that has been in business since 1959 and is currently located at 5353 Balboa Boulevard in Encino, California. West Val Pharmacy indirectly purchased and continues to purchase Defendants' generic Propranolol products at supracompetitive prices during the Class Period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

31.     Plaintiff Halliday's & Koivisto's Pharmacy ("Halliday's") is an independent pharmacy located at 4133 University Boulevard in Jacksonville, Florida. Halliday's has served the Jacksonville community for over 50 years. Halliday's indirectly purchased and continues to purchase Defendants' generic Propranolol products at supracompetitive prices during the Class Period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

32.     Plaintiff Russell's Mr. Discount Drugs, Inc. ("Russell's") was a privately held independent pharmacy located at 334 Depot Street, in Lexington, Mississippi from the time of its opening in February 1986 until it sold the prescription drugs portion of its business to a pharmacy chain on July 14, 2016. Russell's indirectly purchased Defendants' generic Propranolol products at supracompetitive prices during the class period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

33.     Plaintiff Falconer Pharmacy, Inc. ("Falconer") is a privately held independent pharmacy located in Falconer, New York. Falconer Pharmacy indirectly purchased and continues to purchase Defendants' generic Propranolol products at supracompetitive prices during the Class Period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct. Falconer made some purchases of Defendants' Propranolol products directly from Defendant Teva.

34.     Plaintiff Chet Johnson Drug, Inc. ("Chet Johnson") is a privately held independent pharmacy in Amery, Wisconsin. Chet Johnson indirectly purchased and continues to purchase Defendants' generic Propranolol products at supracompetitive prices during the Class Period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

B.      **Defendants**

1.      **Actavis Defendants**

35.     Defendant Actavis Holdco U.S., Inc. ("Actavis Holdco") is a Delaware corporation with its principal place of business in Parsippany, New Jersey.  In August 2016, Teva Pharmaceutical USA, Inc. acquired the Actavis Generics business of Allergan plc, including Actavis, Inc. Upon the acquisition, Actavis, Inc.—the acquired Allergan plc generics operating company (formerly known as Watson Pharmaceuticals)—was renamed Allergan Finance, LLC, which in turn assigned all of the assets and liabilities of the former Allergan plc generic business to the newly formed Actavis Holdco, including subsidiaries Actavis Pharma, Inc. and Actavis Elizabeth LLC (a research and development and manufacturing entity for Actavis generic operations), among others. Actavis Holdco is a wholly owned subsidiary of Teva Pharmaceuticals USA, Inc., which is a Delaware corporation with its principal place of business in North Wales,

FILED WITH REDACTIONS – PUBLIC VERSION

Pennsylvania.   Teva Pharmaceutical USA, Inc. is a wholly owned subsidiary of Teva Pharmaceutical Industries Ltd., an Israeli entity.

36.     Defendant Actavis Pharma, Inc. is Delaware corporation with its principal place of business in Parsippany, New Jersey.  It is a wholly owned subsidiary of Actavis Holdco and is a principal operating company in the U.S. for Teva's generic products acquired from Allergan plc. It manufactures, markets, and/or distributes generic drugs, including Propranolol. Actavis Pharma, Inc. is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

37.     Unless addressed individually, Actavis Holdco and Actavis Pharma, Inc. are collectively referred to herein as "Actavis."   During the Class Period, Actavis sold generic Propranolol in this District and other locations in the United States.

### 2.     Breckenridge

38.     Defendant Breckenridge Pharmaceuticals, Inc. ("Breckenridge") is a Delaware corporation with its headquarters in Boca Raton, Florida.  During the Class Periods, Breckenridge sold generic Propranolol in this District and other locations in the United States.

### 3.     Heritage

39.     Defendant Heritage Pharmaceuticals, Inc. ("Heritage") is a Delaware corporation with its principal place of business in Eatontown, New Jersey.  It is the exclusive United States commercial operation for Emcure Pharmaceuticals Private Ltd., an Indian company headquartered in Pune, India.  During the Class Periods, Heritage sold generic Propranolol to customers in this District and other locations in the United States.

**FILED WITH REDACTIONS – PUBLIC VERSION**

### 4.    Mylan Defendants

40.    Defendant Mylan Inc. is a Pennsylvania corporation with its principal place of business in Canonsburg, Pennsylvania.

41.    Defendant Mylan Pharmaceuticals, Inc. is a West Virginia corporation with its principal place of business in Morgantown, West Virginia.  It is a subsidiary of Mylan Inc. Mylan Pharmaceuticals, Inc. is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania. Mylan Inc. and Mylan Pharmaceuticals, Inc. are wholly-owned subsidiaries of Mylan N.V., a Dutch pharmaceutical company.  Unless addressed individually, Mylan Inc. and Mylan Pharmaceuticals, Inc. are collectively referred to herein as "Mylan."  During the Class Periods, Mylan sold generic Propranolol to customers in this District and other locations in the United States.

### 5.    Par

42.    Defendant Par Pharmaceutical Inc. ("Par") is a New York corporation with its principal place of business in Chestnut Ridge, New York.  Par is a wholly-owned subsidiary of Endo International plc ("Endo"), an Irish corporation with its principal place of business located in Dublin, Ireland.  In September 2015, Endo completed an acquisition of Par Pharmaceuticals Holdings, Inc. and combined it with Endo's existing generics subsidiary, Qualitest Pharmaceuticals ("Qualitest"), naming the segment Par Pharmaceutical, Inc.  Par is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.  During the Class Periods, Qualitest sold generic Propranolol to customers in this District and other locations in the United States.  In this complaint, Defendant Par and Qualitest will be referred to collectively as "Par."

### 6.   Teva

43.   Defendant Teva Pharmaceuticals USA, Inc. ("Teva") is a Delaware corporation with its principal place of business in North Wales, Pennsylvania. It is a subsidiary of Teva Pharmaceutical Industries Ltd., an Israeli entity. Teva is registered with the Pennsylvania Department of State as a foreign corporation. On October 3 2016, Teva Pharmaceutical Industries Ltd. announced that it had completed its acquisition of the wholesaler Anda, Inc. ("Anda") and that "Anda, Inc., one of the leading distributors of generic medicines in the U.S., is now part of Teva."  As announced at the time, Anda, Inc. has "become part of Teva's distribution network," creating a functional economic unity between Teva and Anda such that, as of October 2016, Teva has sold its Propranolol products, as well as the Propranolol products of Teva's co-conspirators, to independent pharmacies throughout the United States, including to Plaintiff Falconer Pharmacy.

### 7.   Upsher-Smith

44.   Defendant Upsher-Smith Laboratories, LLC ("Upsher-Smith") is a Minnesota limited liability company with its principal place of business in Maple Grove, Minnesota.  It is wholly owned by Sawai Pharmaceutical Co., Ltd. ("Sawai"), a large publicly traded generic pharmaceutical company in Japan.  Sawai acquired Upsher-Smith Laboratories, Inc. in June 2017. During the Class Periods, Upsher-Smith sold generic Propranolol to customers in this District and other locations in the United States.

45.   Various other persons, firms, corporations and entities have participated as co-conspirators with Defendants in the violations and conspiracy alleged herein. In order to engage in the violations alleged herein, these co-conspirators have performed acts and made statements in furtherance of the antitrust violations and conspiracies alleged herein.  Plaintiffs may amend this Complaint to allege the names of additional co-conspirators as they are discovered.

**FILED WITH REDACTIONS – PUBLIC VERSION**

## V.   INTERSTATE AND INTRASTATE TRADE AND COMMERCE

46.    During the Class Periods, Defendants sold and distributed generic Propranolol in a continuous and uninterrupted flow of interstate commerce to customers throughout the United States, including in this District.

47.    Defendants' and their co-conspirators' conduct, including the marketing and sale of generic Propranolol, took place within the United States and has had, and was intended to have, a direct, substantial, and reasonably foreseeable anticompetitive effect upon interstate commerce within the United States.

48.    Defendants' anticompetitive conduct occurred in part in trade and commerce within the states and territories set forth herein, and also had substantial intrastate effects in that, *inter alia*, retailers within each state and territory were foreclosed from offering less expensive generic Propranolol to Plaintiffs inside each respective state and territory.  The foreclosure of these less expensive generic products directly impacted and disrupted commerce for Plaintiffs within each state and territory and forced Plaintiffs to pay supracompetitive prices.

## VI.   BACKGROUND OF THE GENERIC DRUG INDUSTRY

### A.    Generic drugs are commodity products that compete on price

49.    Approximately 88% of all pharmaceutical prescriptions in the United States are filled with a generic drug.[19]  "In 2015, generic drug sales in the United States were estimated at $74.5 billion."[20]

---

[19] GPhA, *Generic Drug Savings in the U.S.* at 1 (2015) ("GPhA Report"), *available at* http://www.gphaonline.org/media/wysiwyg/PDF/GPhA_Savings_Report_2015.pdf.
[20] Connecticut AG, Press Release (Dec. 15, 2016), *available at* http://www.ct.gov/ag/cwp/view.asp?Q=588538&A=2341.

**FILED WITH REDACTIONS – PUBLIC VERSION**

50.     According to the U.S. Food & Drug Administration ("FDA"), a generic drug is "the same as a brand name drug in dosage, safety, strength, how it is taken, quality, performance, and intended use."[21]  Once the FDA approves a generic drug as "therapeutically equivalent" to a brand drug, the generic version "can be expected to have equal effect and no difference when substituted for the brand name product."[22]

51.     In a competitive market, generic drugs cost substantially less than branded drugs. The U.S. Congressional Budget Office ("CBO") estimates that, "[o]n average, the retail price of a generic drug is 75 percent lower than the retail price of a brand-name drug."[23]

52.     Because each generic is readily substitutable for another generic of the same brand drug, pricing is the main differentiating feature.  As recognized by the FTC, "generic drugs are commodity products" and, as a consequence of that, are marketed "primarily on the basis of price."[24]  In a competitive market, generic manufacturers cannot significantly increase prices (or maintain high prices in the face of a competitor's lower price) without losing a significant volume of sales.

53.     It is well-established that competition among generic manufacturers drives down price.  Before generic drugs enter a market, the brand drug has a monopoly and captures 100% of sales.  When lower-priced generics become available, the brand drug quickly loses market share

---

[21] FDA Website, *available at* http://www.fda.gov/Drugs/InformationOnDrugs/ucm079436.htm#G (last visited Aug. 10, 2017).
[22] *Id.*
[23] CBO, *Effects of Using Generic Drugs on Medicare's Prescription Drug Spending* at 8–9 (Sep. 15, 2010), *available at* https://www.cbo.gov/sites/default/files/111th-congress-2009-2010/reports/09-15-prescriptiondrugs.pdf.
[24] FTC, *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact* (Aug. 2011), *available at* https://www.ftc.gov/sites/default/files/documents/reports/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission.pdf.

**FILED WITH REDACTIONS – PUBLIC VERSION**

as purchasers switch to the less expensive alternatives.  Over time, the price of a generic drug approaches the manufacturers' marginal costs.  As illustrated in the following chart, the price of a generic drug tends to decrease as more generic drug manufacturers enter the market:



**Generic Competition and Drug Prices**

Source:  FDA analysis of retail sales data from IMS Health, IMS National Sales Perspective (TM), 1999-2004, extracted February 2005

54.     When new entrants join a competitive generic market, they typically will price their product below the prevailing market price in order to gain market share.  A recent government report confirmed this phenomenon in interviews with generic manufacturers: "manufacturers said that if a company is bringing a generic drug into an established drug market, it typically offers a price that is lower than the current market price in order to build its customer base.  Manufacturers also said that as each new manufacturer enters an established generic drug market the price of that generic will fall, with one manufacturer noting that it is typically a 20 percent price decline per entrant."[25]

---

[25] GAO, GAO-16-706, Report to Congressional Requesters, Generic Drugs Under Medicare at 23 (Aug. 12, 2016) ("GAO Report"), *available at* http://www.gao.gov/assets/680/679022.pdf.

**FILED WITH REDACTIONS – PUBLIC VERSION**

55.     When there are multiple generic manufacturers in an established generic market—as with generic Propranolol—prices should remain low and stable, and should not increase absent a market disruption or, as is the case here, anticompetitive conduct.

**B.     Pricing of generic drugs discourages unilateral price increases**

56.     In simple terms, the generic pharmaceutical supply chain flows as follows: Manufacturers sell drugs to wholesalers. Wholesalers sell drugs to pharmacies. Pharmacies dispense the drugs to consumers, who pay the full retail price if they are uninsured, or a portion of the retail price (e.g., a co-pay or co-insurance) if they are insured.  The insured consumers' health plans then pay the pharmacies additional amounts that are specified in agreements between them and the pharmacies.  These agreements are sometimes arranged by middlemen known as Pharmacy Benefit Managers ("PBMs").

57.     Because the prices paid by purchasers of generic drugs differ at each level of the market and most of the transactions occur between private parties according to terms that are not publicly disclosed, the price of a given drug is not always obvious.  Marketwide pricing for a given drug, however, may be observed through the Centers for Medicare & Medicaid Services ("CMS") survey of National Average Drug Acquisition Cost ("NADAC").  NADAC was "designed to create a national benchmark that is reflective of the prices paid by retail community pharmacies to acquire prescription . . . drugs."[26] "NADAC is a simple average of the drug acquisition costs submitted by retail pharmacies," in effect "a single national average."[27] Thus, NADAC is one way to track general price trends in the marketplace.

---

[26] CMS, Methodology for Calculating the National Average Drug Acquisition Cost (NADAC) for Medicaid Covered Outpatient Drugs at 5, *available at* https://www.medicaid.gov/medicaid-chip-program-information/by-topics/prescription-drugs/ful-nadac-downloads/nadacmethodology.pdf.

[27] *Id.*

**FILED WITH REDACTIONS – PUBLIC VERSION**

58.     While NADAC provides the average price level across all manufacturers of a given drug, other price measures are manufacturer-specific. Drug manufacturers typically report benchmarks—like Wholesale Acquisition Cost ("WAC")—for their drugs, which are then published in compendia used by participants in the pharmaceutical industry. The benchmarks are not actual transaction prices; rather, they are the manufacturer's reported list price, which is sometimes subject to discounts. In order track manufacturer-specific pricing, this complaint uses QuintilesIMS's National Sales Perspectives ("NSP") data, which "captures 100% of the total U.S. pharmaceutical market, measuring sales at actual transaction prices rather than using an average wholesale price" and includes sales by manufacturers into various outlets.[28]

59.     When third-party payers (e.g., health plans) pay pharmacies to dispense drugs to their covered patients, the amount is typically determined with reference to a benchmark or list price like a WAC. Some third-party payers and PBMs have implemented their own individual caps—Maximum Allowable Cost ("MAC")—that set the maximum amounts they will pay pharmacies for some generic drugs, regardless of the pharmacies' acquisition costs. A pharmacy must often dispense the drug at a loss if it cannot find a wholesaler offering the drug at a price or below the MAC cap.

60.     Although MAC caps do not apply directly to manufacturers, these caps impose a restraint on manufacturers' prices. The MAC cap essentially limits the pharmacies' discretion to adjust retail prices upwards, so pharmacies are incentivized to buy from the cheapest wholesaler and wholesalers to buy from the cheapest manufacturer. This additional pressure on prices means a generic manufacturer that increases its price for a drug should expect to lose sales to a competitor

---

[28] IMS Institute for Healthcare Informatics, HSRN Data Brief: National Sales Perspectives at 1, *available at* https://www.imshealth.com/files/web/IMSH%20Institute/NSP_Data_Brief-.pdf.

with a lower price.  Consequently, in the absence of coordinated pricing activity among generic manufacturers, an individual manufacturer should not be able to significantly increase its price (or maintain a higher price in the face of a significantly lower competitor price) without incurring the loss of a significant volume of sales.  In a market with MAC caps, it is unlikely that a generic drug manufacturer would risk raising its price unless it has been agreed with competitors that they will raise their prices, too.

## VII.  THE GENERIC PROPRANOLOL CONSPIRACY

### A.  The generic Propranolol market

61.     Propranolol is sold throughout the United States and its territories.  The market for generic Propranolol is mature and Defendants that operate in that market can only gain market share by competing on price.

62.     Propranolol was discovered in 1964 and is the generic version of Inderal.  The FDA approved Inderal, developed by Wyeth Pharmaceuticals, Inc., in 1967.  Propranolol is a beta-blocker.  Beta-blockers are medications used by doctors and patients to manage cardiac arrhythmias; they operate by blocking the receptor sites for epinephrine (adrenaline) and norepinephrine (noradrenaline) on adrenergic beta receptors.  Propranolol is used to treat tremors, angina (chest pain), hypertension (high blood pressure), heart rhythm disorders, and other heart or circulatory conditions.  Propranolol is also used to treat or prevent heart attack, and to reduce the severity and frequency of migraine headaches.  Propranolol is reportedly the highest-selling beta-blocker as measured by prescriptions.

63.     At all relevant times, Defendants had substantial market power with respect to generic Propranolol.  Defendants exercised this power to maintain supracompetitive prices for Propranolol without losing so many sales as to make the elevated price unprofitable.

FILED WITH REDACTIONS – PUBLIC VERSION

64.     Defendants sold generic Propranolol at prices in excess of marginal costs, in excess of a competitive price, and enjoyed high profit margins.

65.     During the Class Periods, Defendants dominated the Propranolol market.  For Propranolol capsules the combined market share of the Defendants was approximately ███

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████

66.     Through their market dominance, Defendants have successfully foreclosed the market to rival competition, thereby maintaining and enhancing market power and enabling Defendants to charge Plaintiffs supracompetitive prices for generic Propranolol.

**B.     Generic Propranolol price increases**

67.     As the following chart (based on NADAC data) indicates, prices for generic Propranolol capsules—which are sold by Defendants Actavis, Breckenridge, and Upsher-Smith ("Capsule Defendants")—began to rise in approximately March 2013, and thereafter increased significantly.  Prices appear to reflect a "one-way ratchet":  prices never decreased substantially, as one would expect if sudden price increases reflected temporary supply shortages, cost increases, or other benign market factors.

**FILED WITH REDACTIONS – PUBLIC VERSION**



68.    Similarly, as the following chart based on NADAC data indicates, prices for generic Propranolol tablets—which are sold by Defendants Actavis, Heritage, Mylan, Par, and Teva ("Tablet Defendants")—rose significantly, beginning in 2015.  These prices, too, reflected a one-way ratchet, and did not decrease substantially as would be expected if the increases had a benign market explanation.



C.   **Extended release capsules**

69.   Defendants Actavis, Breckenridge, and Upsher-Smith have been the primary sellers of Propranolol capsules and increased their prices by similar amounts at similar times.

70.   For the two and a half years before the capsules conspiracy began, transaction prices for Propranolol capsules were only 57 cents per capsule on average and were at times as low as 44 cents per capsule.  After Defendants agreed to raise and fix prices, the average price doubled, regularly reaching more than ███████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████

71.   Data showing Medicaid reimbursements—the amounts that Medicaid has paid to cover its beneficiaries' prescription drug purchases—provides prices by manufacturer and

confirms that Defendants increased their prices for generic Propranolol in very similar fashion over time for both Propranolol capsules and tablets.

72.     The following charts display the per-unit amounts that Medicaid has reimbursed for its beneficiaries' purchases of Defendants' generic Propranolol capsule products:



PROPRANOLOL: Avg. Reimb. per Unit (CAP60MG--100)



**FILED WITH REDACTIONS – PUBLIC VERSION**



73.     The following charts, based on National Sales Perspectives ("NSP") data obtained

from IMS Health, illustrate the abrupt price shift that occurred in Defendants' effective prices for

generic Propranolol capsules[29]:

---

[29] Plaintiffs calculate Defendants' effective prices based on IMS Health's National Sales
Perspectives (NSP) data, which "captures 100% of the total U.S. pharmaceutical market,
measuring sales at actual transaction prices[.]" IMS Institute for Healthcare Informatics, HSRN
Data Brief: National Sales Perspectives at 1, *available at*
https://www.imshealth.com/files/web/IMSH%20Institute/NSP_Data_Brief-.pdf. Effective prices
are calculated to 12 decimals; for ease of reference, prices in this complaint are rounded to the
nearest cent. However, percentage increases are calculated based on the more precise calculated
price (i.e., the number defined by as many as 12 decimals).

**FILED WITH REDACTIONS – PUBLIC VERSION**



**FILED WITH REDACTIONS – PUBLIC VERSION**



**FILED WITH REDACTIONS – PUBLIC VERSION**



**Breckenridge**

74.     Between October 2013 and December 2013, Breckenridge increased the effective prices for its four dosages of generic Propranolol capsules between ███████████ Breckenridge's effective prices continued to rise during the Propranolol Capsules Class Period.

75.     Between October 2013 and May 2014, Breckenridge increased the effective price of the 60 mg dosage by ████████████████████████

76.     Between October 2013 and April 2014, Breckenridge increased the effective price of the 80 mg dosage by ████████████████████████

77.     Between October 2013 and May 2014, Breckenridge increased the effective price of the 120 mg dosage by ████████████████████████

**FILED WITH REDACTIONS – PUBLIC VERSION**

78.     Between October 2013 and April 2014, Breckenridge increased the effective price of the 160 mg dosage by ███████████████████████████████.

79.     Breckenridge's effective prices remain well above pre-conspiracy rates. For example, in November 2016, the effective price for its 120 mg capsule was ███████████ ██████████████████████████████████████████████████████████ ████████████████████████████████.

**Actavis**

80.     Between October 2013 and February 2014, for its four dosages of generic Propranolol capsules, Actavis increased its effective prices between ████████ and its effective prices continued to rise during the Propranolol Capsules Class Period.

81.     Between October 2013 and May 2014, Actavis increased the effective price for the 60 mg Propranolol capsules by ███████████████████████.

82.     Between October 2013 and May 2014, Actavis increased the effective price for the 80 mg Propranolol capsules by ███████████████████████.

83.     Between October 2013 and June 2014, Actavis increased the effective price for the 120 mg Propranolol capsules by ███████████████████████.

84.     Between October 2013 and October 2014, Actavis increased the effective price for the 160 mg Propranolol capsules by ███████████████████████.

85.     Actavis's effective prices remain above pre-conspiracy rates.  For example, in November 2016, the effective price for its 160 mg capsule was $1.18 per capsule, representing a 228% increase from pre-conspiracy prices.

**FILED WITH REDACTIONS – PUBLIC VERSION**

**Upsher-Smith**

86.     Upsher-Smith began substantially increasing its effective prices across all dosages of generic Propranolol capsules in December 2013, representing a ▇▇▇▇▇▇▇ increase in comparison to its October 2013 prices.  Upsher-Smith's effective prices continued to rise during the Propranolol Capsules Class Period.

87.     Between October 2013 and April 2014 Upsher-Smith increased prices for the 60 mg capsules by ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

88.     Between October 2013 and March 2014, Upsher-Smith increased prices for the 80 mg capsules by ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

89.     Between October 2013 and January 2014, Upsher-Smith increased prices for the 120 mg capsules ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

90.     Between October 2013 and March 2014, Upsher-Smith increased prices for the 160 mg capsules ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

91.     Upsher-Smith's effective prices remain well above pre-conspiracy rates.  For example, in November 2016, the effective price for its 160 mg capsule was ▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

**D.     Tablets**

92.     Defendants Actavis, Heritage, Mylan, Par, and Teva have been the primary sellers of Propranolol tablets and increased their prices by similar amounts at similar times.

93.     In the four years before the tablets conspiracy began, transaction prices for Propranolol tablets remained under 4 cents per pill on average, sometimes reaching as low as 3 cents per pill on average.  After the conspiracy started, the average price was regularly over ▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ During

**FILED WITH REDACTIONS – PUBLIC VERSION**

the conspiracy period, some Defendants charged almost 30 cents per pill on average across all dosage strengths of their tablet products.

94.     The following charts display the per-unit amounts that Medicaid has reimbursed for its beneficiaries' purchases of Defendants' generic Propranolol capsule tablets:







**FILED WITH REDACTIONS – PUBLIC VERSION**





**FILED WITH REDACTIONS – PUBLIC VERSION**





**FILED WITH REDACTIONS – PUBLIC VERSION**





**FILED WITH REDACTIONS – PUBLIC VERSION**

95.     The prices for Propranolol tablets had been stable for a substantial period until December 2014.  As alleged below, most of the Tablet Defendants began their price increases in January and February 2015.

96.     Heritage began increasing its effective prices in January 2015 for its 60 mg Propranolol tablets.  Heritage initiated the tablet price increase by raising the effective price for its 60 mg tablets by over threefold in January 2015, from ████████████████████████████ ██████████████████████████████.

97.     In March 2015, Teva began increasing its effective prices for 60 mg Propranolol tablets to ████████████████████████████████████████ Teva continued to raise its effective prices for its 60mg dosage.  Between December 2014 and January 2016, Teva increased the price of its 60 mg Propranolol tablets by ██████████████ ████████████.

98.     Also in March 2015, Mylan began increasing its effective prices for its 60 mg Propranolol tablets, from ██████████████████████████████████. Mylan continued to increase its effective prices.  Between December 2014 and November 2015, Mylan increased the price of its 60 mg Propranolol tablets by ████████████████████ ████████.

99.     In May 2015, Par began increasing its effective prices for its 60 mg Propranolol tablets. Between December 2014 to May 2015, Par increased the effective price for its 60 mg tablets by approximately ████████████████████████ in May 2015.

100.    There are no legitimate reasons or competitive explanations for Defendants' unprecedented and dramatic price increases for Propranolol capsules and tablets.  Because

Propranolol is a commodity product, absent a cartel, it would be expected that any manufacturer who raised the price of the drug would lose customers to manufacturers who did not raise prices. As a result, it would not be in any manufacturer's self-interest to raise the price of Propranolol unless an agreement existed with other manufacturers to raise prices.  Moreover, During the Class Periods, the costs of manufacturing Propranolol remained stable, as did supply and demand.  There were no supply shortages or disruptions, new patents or formulations, or changes in the drug labeling that could explain the abrupt, dramatic, and uniform price hike.  And yet, each Defendant raised the prices of Propranolol by extraordinary margins.  Absent the existence of a cartel, such price increases would not have been in each Defendant's self-interest

101.    There were no reported shortages of Propranolol capsules that could account for Defendants' price increases.

102.    Federal law requires drug manufacturers to report potential drug shortages to the FDA, the reasons therefor, and the expected duration of the shortage.  No supply disruption was reported to the FDA by Defendants with respect to Propranolol during the Class Periods.

103.    Reports on the American Society of Health-System Pharmacists ("ASHP") Drug Shortage website about Propranolol tablet availability during the latter part of the Propranolol Tablets Class Period are contradicted by IMS manufacturer units sales data, but even if the reports were validated, none supports Tablet Defendants' early 2015 price increases:

(a)    Par (Qualitest) provided no notices of shortages.

(b)    Mylan did not report shortages (or back orders) until October 2015 through March of 2016. Despite reports, Mylan's sales volume actually increased several fold in 2015 and 2016 in comparison to 2014.

(c)    Teva "could not provide a reason for the shortage[s]" it reported of certain counts of its tablets beginning in July 2015 and through September of 2016.  Despite the reports, Teva (now Impax) also

increased its sales volume over the Propranolol Tablets Class Period.

(d)    ASHP reported in July and October 2015 that Actavis had a shortage only of its 80 mg, 500 count tablets and like Teva, it could not "provide a reason for the shortage." Despite the report, Actavis actually sold more units of 80 mg tablets in 2015 than in 2014.

(e)    In July 2015 Heritage reported a shortage across all dosages, citing "a raw materials issue" which no other manufacturers reported. And in December 2015 through September 2016, ASHP reported that Heritage was not marketing Propranolol tablets at that time. Despite "not marketing tablets" at this time, IMS unit sales data shows that after low volumes in late 2015 through mid-2016, Heritage's sales volume increased in June 2016 and held steady through November 2016.

### E.    Defendants' Conspiracy[30]

104.    Defendants' sudden and massive price increases represented a sharp departure from the previous years of low and stable prices.  These dramatic price increases were the product of an illicit understanding among Defendants.

105.    In order to be successful, collusive agreements require a level of trust among the conspirators.  While this can be accomplished by one-on-one communications, collaboration is also fostered through industry associations, which facilitate relationships between individuals who should otherwise be predisposed to compete vigorously with each other.

106.    Defendants' price increases began shortly after the Defendants attended meetings of the Generic Pharmaceutical Association ("GPhA")[31] in February 2013 (for capsules) and after a National Association of Chain Drug Stores ("NACDS") meeting in December 2014 (for tablets).

---

[30] The allegations included in this section pertaining to the HDMA, NACDS, MMCAP, and ECRM are based in part upon documents produced to plaintiffs pursuant to subpoenas duces tecum issued in *In re Propranolol Antitrust Litigation*, No. 16-cv-9901 (S.D.N.Y.).

[31] GPhA was recently renamed the Association for Accessible Medicines, but is referred to GPhA throughout.

**FILED WITH REDACTIONS – PUBLIC VERSION**

At these and similar meetings, as set forth below, senior executives of each Defendant reached agreement and monitored compliance.

107.    Defendants and their senior executives are active members of the GPhA.  GPhA calls itself the "leading trade association for manufacturers and distributors of generic prescription drugs."[32]  GPhA was formed in 2000 from the merger of three industry trade associations: the Generic Pharmaceutical Industry Association, the National Association of Pharmaceutical Manufacturers, and the National Pharmaceutical Alliance.  GPhA's website touts, "[b]y becoming part of GPhA, you can participate in shaping the policies that govern the generic industry" and lists its "valuable membership services, such as business networking opportunities, educational forums, access to lawmakers and regulators, and peer-to-peer connections."[33]  GPhA's "member companies supply approximately 90 percent of the generic prescription drugs dispensed in the U.S. each year."

108.    A number of Defendants' high-ranking corporate officers served on GPhA's Board of Directors before and during the Class Periods:

> (a)    **2012 Board of Directors**: Tony Mauro, President of Mylan North America; Debra Barrett, Sr. VP of Government and Public Affairs for Teva; Doug Boothe, President and CEO of Actavis; and Jeffrey Glazer, CEO of Heritage.
>
> (b)    **2013 Board of Directors**: Tony Mauro, President of Mylan North America; Debra Barrett, Sr. VP of Global Government Affairs and Public Policy for Teva; Jeffrey Glazer, President and CEO of Heritage; and Charlie Mayr, Chief Communications Officer at Actavis.

---

[32] GPhA, The Association, *available at* http://web.archive.org/web/20150413013801/http://www.gphaonline.org:80/about/the-gpha-association.

[33] GPhA, Membership, *available at* http://web.archive.org/web/20150413013008/http://www.gphaonline.org:80/about/membership/.

**FILED WITH REDACTIONS – PUBLIC VERSION**

(c) **2014 Board of Directors**:  Jeffrey Glazer, CEO of Heritage; Tony Mauro, President of Mylan North America; and Allan Oberman, President and CEO of Teva Americas Generics.

(d) **2015 Board of Directors**: Debra Barrett, Sr. VP Global Government Affairs for Teva; Jeff Glazer, CEO of Heritage; Marcie McClintic Coates, VP & Head of Global Regulatory Affairs for Mylan; and Tony Pera, Chief Commercial Officer for Par Pharmaceuticals.

(e) **2016 Board of Directors**: Debra Barrett, Sr. VP Global Government Affairs for Teva; Heather Bresch, CEO of Mylan; and Tony Pera, Chief Commercial Officer for Par Pharmaceuticals.

109.    The Capsule Defendants all attended either or both of the October 1–3 2012 Technical Conference in Bethesda Maryland and the February 20–22, 2013 Annual meeting in Orlando Florida.  The Tablet Defendants (and/or their corporate parents) attended the 2015 GPhA Annual Meeting in Miami, Florida between February 9 and 11, 2015.  These meetings provided additional "networking events," which presented opportunities for collusion through informal, off-premises events, such as golf tournaments, fly-fishing outings, and kayaking trips.

110.    Defendants also had opportunities to collude through their involvement in the NACDS.  According to its website, the NACDS is a trade organization whose mission "is to advance the interests and objectives of the chain community pharmacy industry by fostering its growth and promoting its role as a provider of healthcare services and consumer products."[34] Membership in the NACDS is open to generic pharmaceutical manufacturers, and Defendants Breckenridge, Heritage, Mylan, Par, Teva, and Upsher-Smith were NACDS members from 2013 through 2016.  Members have access to custom industry research and industry publications, can participate in NACDS committees and workgroups, and attend various conferences.

---

[34] NACDS, *Mission*, *available at* https://www.nacds.org/about/mission/ (last visited July 28, 2017).

**FILED WITH REDACTIONS – PUBLIC VERSION**

111.    On April 20–23, 2013, NACDS held its Annual Meeting in Palm Beach, Florida. NACDS describes the Annual Meeting as "the industry's most prestigious gathering of its most influential leaders," and a "classic 'Top-to-Top' business conference" attended by "senior management" in the pharmaceutical retailing and manufacturing industries.[35]   Attendees are provided a list of participating companies in advance, and have access to private meeting rooms where executives can meet face-to-face.   And attendees can choose from a variety of business programs, "invitation only" events, and social functions.   The following of Defendants' representatives, among others, attended NACDS's 2013 Annual Meeting:

(a)   **Defendant Actavis:** Paul Bisaro, Board Member; Andrew Boyer, President and CEO of North America Generics; Michael Reed, Executive Director of Trade Relations; Michael Baker, Executive VP of Trade Sales and Development; Paul Reed, Sr. Director of Trade Sales and Development; and Robert Stewart, Chief Operating Officer;

(b)   **Defendant Mylan:** Joe Duda, President; Tony Mauro, Chief Commercial Officer; Robert Potter, Sr. VP of North America National Accounts and Channel Development; Jeffrey May, VP of North America Product Strategy; and Jim Nesta, VP of Sales;

(c)   **Defendant Par:** Paul Campanelli, President; Jon Holden, VP of Sales; Michael Altamuro, VP of Marketing and Business Analytics; and Renee Kenney, Sr. Advisor for Generic Sales;

(d)   **Defendant Teva:** Jeremy Levin, President and CEO; Allan Oberman, President and CEO of Teva Americas Generics; Maureen Cavanaugh, Sr. VP and Chief Operating Officer of North America Generics; Teri Coward, Sr. Director Sales and Trade Relations; Michael Sine, Director, Corporate Account Group; Jonathan Kafer, Executive VP, Sales and Marketing; David Marshall, VP of Operations; Dave Rekenthaler, VP of Sales; and

(e)   D**efendant Upsher-Smith:** Mark Evenstad, CEO; Thomas Burke, Chief Operating Officer; Brad Leonard, Sr. Director of National

---

[35] NACDS, *Annual Meeting Guide to Success* at 2, *available at*, http://annual.nacds.org/Portals/1/PDFs/an_guide.pdf?ver=2017-07-06-174724-057 (last visited July 28, 2017).

**FILED WITH REDACTIONS – PUBLIC VERSION**

Accounts; Scott Hussey, Sr. VP of Sales; Jim Maahs, VP of Commercial Portfolio Management; and Mike McBride, VP of Partner Relations.

112.    The next year, executives, senior management, and salespeople from Defendants Actavis, Breckenridge, Heritage, Mylan, Par, Teva, and Upsher-Smith attended the NACDS 2014 Annual Meeting held on April 26–29 at The Phoenician resort in Scottsdale, Arizona. This meeting was attended by the following representatives from Defendants, who were key executives for generic drug sales and pricing:

(a)    **Defendant Actavis:** Andrew Boyer, Senior Vice President (Generic Sales, Marketing, National Accounts); Marc Falkin, Vice President (Marketing, Pricing and Contracts);

(b)    **Defendant Breckenridge:** Larry Lapila, President; Brian Guy, Vice President, Business Development; Martin Schatz, Senior Vice President, Sales;

(c)    **Defendant Heritage:** Jeffrey Glazer (then CEO and Chairman);

(d)    **Defendant Mylan:** Joe Duda, President; Tony Mauro, President; Robert Potter, Senior Vice President North America National Accounts and Channel Development; Rob O'Neill, Head of Sales;

(e)    **Defendant Par:** Jon Holden, Vice President of Sales; Paul Campanelli, President; Renee Kenney, Senior Advisor Generic Sales;

(f)    **Defendant Teva:** Theresa Coward, Senior Director of Sales; David Rekenthaler, Vice President, Sales; Maureen Cavanaugh, Senior Vice President and Chief Operating Officer N.A. Generics; Allan Oberman, President and CEO Teva Americas Generics; and,

(g)    **Defendant Upsher-Smith:** Scott Hussey, Senior Vice President, Sales; Brad Leonard, Senior Director, National Accounts; Jim Maahs, Vice President, Commercial Portfolio Management; Mark Evenstad, CEO; Rusty Field, President.

113.    Executives, senior management, and salespeople from Defendants Actavis, Breckenridge, Mylan, Par, Teva, and Upsher-Smith also attended the NACDS 2015 Annual Meeting held on April 25-28 at The Breakers resort in Palm Beach, Florida.

-43-
**FILED WITH REDACTIONS – PUBLIC VERSION**

114.    On August 10–13, 2013, the NACDS held its Total Store Expo at the Sands Expo Convention Center in Las Vegas, Nevada.  The Total Store Expo provides pharmaceutical industry executives with opportunities to meet with each other and to "[f]ollow up on key discussions that were initiated during the NACDS Annual Meeting."[36]   The following of Defendants' representatives, among others, attended the NACDS's 2013 Total Store Expo:

(a)    **Defendant Actavis:** Andrew Boyer, Senior Vice President (Generic Sales, Marketing, National Accounts); Marc Falkin, Vice President (Marketing, Pricing and Contracts);

(b)    **Defendant Breckenridge:** Larry Lapila, President;

(c)    **Defendant Upsher-Smith:** Scott Hussey, Senior Vice President, Sales; Brad Leonard, Senior Director, National Accounts; Michael Muzetras, Sr. National Accounts Manager; Beth Pannier, Senior National Accounts Manager; Mary Rotunno, National Accounts Manager;

(d)    **Defendant Heritage:** Matthew Edelson, Senior Director of Sales; Jeffrey A. Glazer (then CEO and Chairman), Jason T. Malek, SVP (then Senior Vice President, Commercial Operations, and subsequently President), Gina Gramuglia, Commercial Operations; Neal O'Mara, Senior Director, National Accounts; Anne Sather, Senior Director, National Accounts;

(e)    **Defendant Mylan:** Mike Aigner, Director National Accounts; Kevin McElfresh, Executive Director National Accounts; Joe Duda, President; Robert Potter, Senior Vice President North America National Accounts; Rob O'Neill, Head of Sales; Lance Wyatt, Director National Accounts;

(f)    **Defendant Par:** Jon Holden, Vice President of Sales; Renee Kenney, Senior Advisor Generic Sales; Karen O'Connor, Vice President National Accounts; Lori Minnihan, Manager, Pricing & Analytics; Warren Pefley, Director, National Accounts; Charles "Trey" Propst, Vice President, National Accounts; Michael Reiney, Vice President, Sales; Jeremy Tatum, Demand Manager; and,

(g)    **Defendant Teva:** Theresa Coward, Senior Director of Sales; David Rekenthaler, Vice President, Sales; Maureen Cavanaugh, Senior

---

[36] NACDS Total Store Expo, *Why Attend*, *available at* http://tse.nacds.org/attend/why-attend (last visited July 28, 2017).

> Vice President and Chief Operating Officer N.A. Generics; Kevin
> Galowina, Head of Marketing Operations; Jessica Peters, Manager
> of Corporate Accounts; Allan Oberman, President and CEO Teva
> Americas Generics.

115.    Executives, senior management, and salespeople from Defendants Actavis,
Breckenridge, Heritage, Mylan, Par, Teva, and Upsher-Smith attended the NACDS Total Store
Expo on August 23–26, 2014, at the Boston Convention Center in Massachusetts, as well as the
Total Store Expo on August 22–25, 2015 at the Colorado Convention Center in Denver.

116.    On December 3, 2013, NACDS held its 2013 NYC Week and annual foundation
dinner in New York City, which was attended by the following representatives from Defendants:

> (a)    **Defendant Actavis:** Andrew Boyer, Senior Vice President (Generic
> Sales, Marketing, National Accounts); Marc Falkin, Vice President
> (Marketing, Pricing and Contracts);

> (b)    **Defendant Mylan:** Joe Duda, President; Tony Mauro, COO; Robert
> Potter, Senior Vice President North America National Accounts;
> Rob O'Neill, Head of Sales;

> (c)    **Defendant Teva:** Theresa Coward, Senior Director of Sales; David
> Rekenthaler, Vice President, Sales; Maureen Cavanaugh, Senior
> Vice President and Chief Operating Officer N.A. Generics; and,

> (d)    **Defendant Upsher-Smith:** Scott Hussey, Senior Vice President,
> Sales; Jim Maahs, Vice President, Commercial Portfolio
> Management; Mike McBride, Vice President Partner Relations.

117.    At the August 23–26, 2014 NACDS Total Store Expo at the Boston Convention
Center, the following representatives from Defendants, key executives for generic drug pricing
and sales, attended:

> (a)    **Defendant Actavis:** Andrew Boyer, Senior Vice President (Generic
> Sales, Marketing, National Accounts); Marc Falkin, Vice President
> (Marketing, Pricing and Contracts); Richard Rogerson, Executive
> Director (Pricing & Business Analytics);

> (b)    **Defendant Breckenridge:** Larry Lapila, President; Martin Schatz,
> Senior Vice President, Sales;

(c) **Defendant Heritage**: Heather Beem, National Account Manager, Institutional; Katie Brodowski, Associate Director Institutional Sales; Matthew Edelson, Senior Director of Sales; Jeffrey A. Glazer (then CEO and Chairman), Jason T. Malek, SVP (then Senior Vice President, Commercial Operations, and subsequently President); Gina Gramuglia, Commercial Operations; Neal O'Mara, Senior Director, National Accounts; Anne Sather, Senior Director, National Accounts;

(d) **Defendant Mylan:** Joe Duda, President Mylan Pharmaceuticals; Robert Potter, Senior Vice President North America National Accounts and Channel Manager;

(e) **Defendant Par:** Jon Holden, Vice President of Sales; Renee Kenney, Senior Advisor Generic Sales; Lori Minnihan, Manager, Pricing & Analytics; Warren Pefley, Director, National Accounts; Charles "Trey" Propst, Vice President, National Accounts; Michael Reiney, Vice President, Sales; Jeremy Tatum, Demand Manager;

(f) **Defendant Teva:** David Rekenthaler, Vice President, Sales; Maureen Cavanaugh, Senior Vice President and Chief Operating Officer N.A. Generics; Kevin Galowina, Head of Marketing Operations; Jessica Peters, Manager of Corporate Accounts; Nisha Patel, Director of National Accounts; and,

(g) **Defendant Upsher-Smith:** Scott Hussey, Senior Vice President, Sales; Brad Leonard, Senior Director, National Accounts; Jim Maahs, Vice President, Commercial Portfolio Management.

118.    On December 3, 2014, NACDS held its 2014 NYC Week and annual foundation dinner in New York City, which was attended by the following representatives from Actavis, Mylan, and Teva:

(a) **Defendant Actavis:** Andrew Boyer, Senior Vice President (Generic Sales, Marketing, National Accounts); Marc Falkin, Vice President (Marketing, Pricing and Contracts); Brent Saunders, President, CEO and Chairman;

(b) **Defendant Mylan:** Mike Aigner, Director National Accounts; Robert Potter, Senior Vice President North America National Accounts and Channel Development; Tony Mauro, COO; and,

(c) **Defendant Teva:** Theresa Coward, Senior Director of Sales; David Rekenthaler, Vice President, Sales; Maureen Cavanaugh, Senior

Vice President and Chief Operating Officer N.A. Generics; Jessica
Peters, Director National Accounts.

119.    In addition to common membership in the GPhA and the NACDS, Defendants are

involved in an array of buyer-side industry groups, through which they can share pricing strategies,

bid terms, and other competitively sensitive information.  For instance, the Minnesota Multistate

Contracting Alliance for Pharmacy ("MMCAP") is a group purchasing organization operated and

managed by the State of Minnesota's Department of Administration.  According to its website,

"MMCAP member facilities purchase over $1 billion per year and have national account status

with all of the major brand name and generic pharmaceutical manufacturers."[37]    Several of the

Defendants are vendors for the MMCAP.

120.    In 2014, the following Defendant representatives served as vendors for the

MMCAP: Mark Blitman, Executive Director of Sales for Government Markets for Actavis; Scott

Cohon, National Director of Sales for Breckenridge; Anne Sather, National Account Manager for

Heritage; Jan Bell, Director of National Accounts for Mylan; Nick Gerebi, Director of National

Accounts for Teva; and Michelle Brassington, Regional Account Manager for Upsher-Smith.

Defendants have a continuing relationship with the MMCAP, and several of these individuals

served as vendors again in 2016.

121.    On May 12–15, 2014, MMCAP held its National Member Conference in

Bloomington, Minnesota.  MMCAP's 2014 National Member Conference was attended by the

following representatives from Defendants, who were key executives for generic drug sales and

pricing:

---

[37] Mont. State Univ. *Healthcare/ Pharmaceutical Products & Services – Buying at MSU*,
*available at* http://www.montana.edu/buyingatmsu/supplies/HealthcareSupplies.html (last visited
July 28, 2017).

**FILED WITH REDACTIONS – PUBLIC VERSION**

(a) **Defendant Breckenridge:** Scott Cohon, National Accounts Director;

(b) **Defendant Mylan:** Jan Bell, Director, National Accounts;

(c) **Defendant Teva:** Nick Gerebi, National Account Manager;

(d) **Defendant Upsher-Smith:** Michelle Brassington, Regional Account Manager;

(e) **Defendant Actavis:** Mark Blitman, Executive Director of Sales for Government Markets; and,

(f) **Defendant Heritage:** Anne Sather, Director, National Accounts.

122. The Health Care Supply Chain Association is a trade association that represents group purchasing organizations, such as the MMCAP. The Health Care Supply Chain Association hosts events that Defendants attend, at which they have the opportunity to interact with each other and discuss their respective businesses and customers. For example, executives from both Actavis and Teva participated in the LogiPharma Supply Chain Conference on September 16-18, 2014 in Princeton, New Jersey.

123. The Health Care Supply Chain Association also hosted the National Pharmacy Forum on February 16–18, 2015, in Tampa, Florida, where the following representatives of Defendants were present:

(a) **Defendant Actavis:** John Fallon, Executive Director of Sales;

(b) **Defendant Breckenridge:** David Giering, Marketing and Trade Relations Manager;

(c) **Defendant Mylan:** Lee Rosencrance, District Manager; Martin Wingerter, Director of National Accounts; Jan Bell, Director of National Accounts; Heather Paton, VP of Institutional Sales; and Mark Pittenger, Sr. Director of National Accounts; and,

(d) **Defendant Teva:** Nick Gerebi, Director of National Accounts; Jeff McClard, Sr. Director of National Accounts; Cam Bivens, Director of National Accounts; and Brad Bradford, Director of National Accounts.

124.    At the National Pharmacy Forum, speaker topics included: "current pricing and spending trends"; "a critique of the rationale for high prices offered by manufacturers"; and "the U.S. pharmaceutical market and the ongoing changes within the pharmaceutical world," including "upcoming patent cliffs" and "market trends."[38]

125.    In addition to providing an opportunity to share information about the generic pharmaceutical business, these trade association events often include social activities such as theater performances, cocktail parties, and dinners, which allow Defendants' executives to interact with their competitors privately and outside the traditional business setting.

126.    As a result of their involvement in trade associations such as the GPhA, NACDS, MMCAP, and Health Care Supply Chain Association, Defendants had ample opportunities to communicate, signal, and agree to raise the price of Propranolol.

127.    As part of its years-long investigation into anticompetitive pricing activities among generic drug manufacturers, the DOJ is investigating trade associations like the GPhA for creating opportunities for collusion among different generic manufacturers.  The DOJ has stated that trade associations are "one potential avenue for facilitating the collusion between salespeople at different generic producers."[39]

128.    The states attorneys general allegations likewise explain that trade shows "provide generic drug manufacturers . . . with ample opportunity to meet, discuss, devise, and implement a host of anticompetitive schemes that unreasonably restrain competition[.]"[40]   The substantial

---

[38] Healthcare Supply Chain Assoc., *Final Program – 2015 National Pharmacy Forum*, *available at* http://c.ymcdn.com/sites/www.supplychainassociation.org/resource/resmgr/Forum_2015/2015_Pharmacy_Forum_Final_Pr.pdf.

[39] FiercePharma, *DOJ criminal probe takes a look at trade associations*, *available at* http://www.fiercepharma.com/regulatory/doj-criminal-probe-takes-a-look-at-trade-associations.

[40] State AG Compl. ¶ 52.

increases in the prices of generic Propranolol capsules and tablets began within a few weeks of the February 2013 and February 2015 Annual Meetings.

129.    The State AGs allege that Mylan and other generic drug companies used industry trade shows and customer conferences to collude, including conferences hosted by the NACDS,

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

The States further allege: "At these various conferences and trade shows, sales representatives from many generic drug manufacturers . . . have opportunities to interact with each other and discuss their respective business and customers.  Attendant with many of these conferences and trade shows are organized recreational and social events, such as golf outings, lunches, cocktail parties, dinners, and other scheduled activities that provide further opportunity to meet with competitors outside of the traditional business setting.  Of particular importance here, generic drug manufacturer representatives who attend these functions, . . . use these opportunities to discuss and share upcoming bids, specific generic drug markets, pricing strategies and pricing terms in their contracts with customers, among other competitively-sensitive information."[41]

130.    ███████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

---

[41] *Id.* ¶ 51.

**FILED WITH REDACTIONS – PUBLIC VERSION**



**FILED WITH REDACTIONS – PUBLIC VERSION**



132.     In 2016, Defendants also met regularly and attended trade association meetings, conferences, and events, including (a) the April 11–14, 2016 MMCAP National Member Conference in Bloomington, Minnesota at the Minneapolis Airport Marriott and (b) the August 19-22, 2016, NACDS 2016 Total Store Expo at the San Diego Convention Center in San Diego, California.

133.     The State AGs also allege that sales representatives of generic drug manufacturers "get together separately, in more limited groups, allowing them to further meet face-to-face with their competitors and discuss their business."[42]   "In fact, high-level executives of many generic drug manufacturers get together periodically for what at least some of them refer to as 'industry dinners.'"[43]   "At these industry dinners, one company is usually responsible for paying the dinner for all of the attendees.  The company that pays the bill is generally determined by alphabetical order."[44]   Additionally, a large number of generic drug manufacturers, including several Defendants, are headquartered in close proximity to one another in New Jersey, eastern Pennsylvania, or New York, giving them easier and more frequent opportunities to meet and collude.

134.     As a result of these various interactions, Defendants' sales and marketing executives are often acutely aware of their competition and, more importantly, each other's current

---

[42] *Id.* ¶ 53.
[43] *Id.* ¶ 55.
[44] *Id.* ¶ 56.

and future business plans. This familiarity and opportunity often leads to agreements among competitors to fix prices or to allocate a given market so as to avoid competing with one another on price.

135. Defendants routinely communicate and share information with each other about bids and pricing strategy. This can include forwarding bid packages received from a customer (*e.g.*, a Request for Proposal or "RFP") to a competitor, either on their own initiative, at the request of a competitor, or by contacting a competitor to request that the competitor share that type of information.

136. Defendants also share information regarding the terms of their contracts with customers, including various terms relating to pricing, price protection and rebates. Generic drug manufacturers use this information from their competitors to negotiate potentially better prices or terms with their customers, which could be to the ultimate detriment of consumers.

### F.    Defendants' concerted efforts to increase prices for generic Propranolol yielded supracompetitive profits

137. As demonstrated in the charts above, Defendants' agreement led to skyrocketing prices for Propranolol. These price increases were not the product of unilateral business decisions, but resulted instead from agreements to fix prices.

138. The enormous price hikes were not accompanied by a significant change in costs to manufacturers. Thus, the increased prices resulted in an enormous increase in profits to Defendants.

139. For example, on October 30, 2015, John Sheehan, Mylan's CFO, stated in an earnings call:

> With respect to gross margin, I guess I would start by pointing out that since 2010 our gross margins have increased from 45% up to the high end of the guidance range that we indicated we would be at

this year of 55%.  So the gross margins have been sustained.  They have steadily increased over the last five, six years. . . .  It also has been driven by the positive pricing environment that we've seen, especially over the last couple of years in North America.

**G.      Factors increasing the market's susceptibility to collusion**

140.     Publicly available data on the generic Propranolol market in the United States demonstrate that it is susceptible to cartelization by Defendants.  Factors that make a market susceptible to collusion include: (1) a high degree of industry concentration; (2) significant barriers to entry; (3) inelastic demand; (4) the lack of available substitutes for the goods involved; (5) a standardized product with a high degree of interchangeability between the products of cartel participants; and (6) inter-competitor contacts and communication.

**1.      Industry concentration**

141.     The market for both formulations of Propranolol is highly concentrated.  In particular, for Propranolol capsules the combined market share of the Defendants was approximately ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████  ██████████████████████████████████████████████████████

██████

142.     For example, the market share among the Capsule Defendants remained stable from the beginning of the Propranolol Capsule Class Period through November 2016 for all four dosages:



**FILED WITH REDACTIONS – PUBLIC VERSION**



143.    While the market for Propranolol is sufficiently concentrated to facilitate collusion, the years of low and stable pricing in the market establish that the number of manufacturers in the

**FILED WITH REDACTIONS – PUBLIC VERSION**

market was sufficient to drive competition.  Absent collusion, prices would have remained at competitive levels.

144.    No departures from the market by manufacturers of Propranolol can explain the price increases.

145.    Defendants have been able to maintain supracompetitive prices for Propranolol without significant loss of market share to non-conspirators.  Thus, Defendants have oligopolistic market power in the market for Propranolol.

146.    The magnitude of Defendants' price increases for Propranolol distinguishes them from non-collusive oligopolistic pricing.  Non-collusive oligopolistic pricing would be expected to proceed incrementally, as manufacturers test the waters to see if competitors will follow a price increase.[45]  But here the increases are extreme – jumping as much as 650% in one fell swoop. Such extreme pricing moves are not rational in the absence of advance knowledge that competitors will join the increase.

## 2.    Barriers to entry

147.    Supracompetitive pricing in a market normally attracts additional competitors who want to avail themselves of the high levels of profitability that are available.  However, the presence of significant barriers to entry makes this more difficult and helps to facilitate the operation of a cartel.

---

[45] Louis Kaplow, Competition Policy and Price Fixing 262 (2013) (discussing why, in the absence of cost or supply shocks, oligopolists resist "sudden and sharp" price increases, and noting, among other things, that "oligopolsits may increase prices in smaller steps because they do not fully trust each other").  *See also* Richard Posner, Antitrust Law 59 (2d ed. 2001) (discussing the various challenges faced by oligopolists when attempting to increase price and why rational economic behavior undermines the ability to effect large and parallel price increases).

148.     There are significant capital, regulatory, and intellectual property barriers to entry in the generic Propranolol markets that make such entry time-consuming and expensive.

149.     Start-up costs and regulatory oversight represent substantial barriers to entry in the generic Propranolol markets.

150.     In addition to the significant out-of-pocket costs required to bring a drug to market, the approval process for generic drugs takes significant time.  As Kansas Senator Jerry Moran commented on September 21, 2016 during Congressional hearings on the FDA's role in the generic drug market, "there are more than 4,000 generic drug applications currently awaiting approval, and the median time it takes for the FDA to approve a generic is now 47 months or nearly four years."[46]  This significant delay for new market entrants effectively precludes new competition from eroding the supracompetitive prices imposed by the conspiracy.

### 3.     Demand inelasticity

151.     A product exhibits completely inelastic demand if buyers will continue to buy it regardless of the price. No product is completely inelastic, but prescription medicines come close.

152.     Demand for Defendants' Propranolol products is inelastic largely because, while they are somewhat interchangeable with one another, they cannot be substituted for other products given their pharmacological characteristics. Additionally, the incentives of actors in the Propranolol market are not sensitive to price, as they are in most other markets. Doctors who prescribe Propranolol have the best therapy and not the cheapest cost in mind; patients cannot write themselves a prescription for a cheaper substitute or comfortably forgo treatment; and pharmacies have no choice but to fill the prescription as written. When Defendants increased their Propranolol

---

[46] Sen. Moran, Statement (Sep. 21, 2016), *available at* http://www.appropriations.senate.gov/imo/media/doc/092116-Chairman-Moran-Opening-Statement.pdf.

prices, independent pharmacies could not simply purchase and dispense less-expensive alternative products.

153.    In order for a cartel to profit from raising prices above competitive levels, demand must be sufficiently inelastic such that any loss in sales will be more than offset by increases in revenue on those sales that are made. Otherwise, increased prices would result in declining sales, as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

### 4.    Lack of substitutes

154.    Propranolol is also differentiated from other drug products because of its regulatory status. A generic drug is considered a therapeutic equivalent of—and AB-rated with respect to— the brand name version and other generic versions of that drug.  Defendants' Propranolol products are not therapeutically equivalent to—or AB-rated with respect to—other drug products, even similar drug products.  A patient prescribed Propranolol could not, therefore, purchase a different drug using his or her Propranolol prescription, regardless of the respective prices of the drugs.  The next-best substitute for generic Propranolol is branded Propranolol, which costs significantly more than generic alternatives.

155.    In addition, branded versions of Propranolol do not serve as economic substitutes for generic versions of these compounds because branded products generally maintain substantial price premiums over even their supra-competitively priced generic counterparts, making them inapt substitutes even when generic prices soar.

156.    Thus, purchasers of generic Propranolol are held captive to the supracompetitive prices that resulted from Defendants' conspiracy to fix prices and allocate markets and customers.

### 5.    Standardized product with high degree of interchangeability

157.    A commodity-like product is one that is standardized across suppliers and allows for a high degree of substitutability among different suppliers in the market.  When products offered by different suppliers are viewed as interchangeable by purchasers, it is easier for the suppliers to agree on prices for the goods in question and to monitor those prices effectively.

158.    Generic drugs of the same chemical composition are effectively commodity products because the primary mechanism through which they compete is price.  When approving an ANDA, the FDA confirms that a generic drug product is bioequivalent to the branded version of the drug.  This allows pharmacists to substitute that generic for the branded counterpart, as well as for any other generic that also is bioequivalent to the branded product.

159.    Defendants' generic Propranolol products are bioequivalent generics of their branded counterparts, enabling pharmacists to substitute them (any of them) for branded products.

160.    Moreover, because generic Propranolol products are interchangeable, there is little utility in attempting to distinguish the products based on quality, branding or service.  Accordingly, manufacturers generally spend little effort advertising or detailing (the practice of providing promotional materials and free samples to physicians) their generic compounds.  The primary means for one generic manufacturer to differentiate its product from another's is through price competition.[47]   The need to compete on price can drive producers of commodity products to conspire—as they did here—to fix prices.

---

[47] *See, e.g.*, GAO Report at 23 ("If another manufacturer offers a lower price to a customer, manufacturers we interviewed indicated that they are usually asked to match it or risk losing market share to the other manufacturer.").

FILED WITH REDACTIONS – PUBLIC VERSION

### 6.    Inter-competitor contacts and communications

161.    As discussed above, Defendants' representatives met at conferences convened by customers and trade associations of customers (███████████ and NACDS), private industry dinners, and similar events.  Moreover, Defendants are members of and/or participants of the GPhA; thus, their representatives have many opportunities to meet and conspire at industry meetings.  As noted in press reports, "prosecutors are taking a close look at trade associations as part of their investigation as having been one potential avenue for facilitating the collusion between salespeople at different generic producers."[48]

162.    The State AG Complaint alleges that Defendants routinely coordinated their schemes through direct interaction with their competitors at industry trade shows, customer conferences, and other events.  For example, Heritage's Glazer and Malek admitted at their guilty plea hearings to engaging in discussions and attending meetings with competitors, during which they reached agreements to allocate customers, rig bids and fix prices of doxycycline hyclate and glyburide.

163.    DOJ's and the Connecticut AG's investigations, and the grand jury subpoenas and investigative demands that have issued in conjunction with them, focus on inter-competitor communications.  These types of communications are not unique or isolated, but are rampant; "[g]eneric drug manufacturers operate, through their respective senior leadership and marketing and sales executives, in a manner that fosters and promotes routine and direct interaction among their competitors."[49]  The sheer number of companies implicated in the investigations highlights

---

[48] PaRR Report.
[49] State AG Compl. ¶ 7.

the prevalence in the generic drug industry of the types of contacts and communications that facilitate collusion:

(a) **Actavis**: In February 2016, Actavis's predecessor, Allergan plc, disclosed that it received a DOJ subpoena "seeking information relating to the marketing and pricing of certain of the Company's generic products and communications with competitors about such products."[50]

(b) **Aurobindo**: Aurobindo has disclosed receipt of a subpoena relating to the DOJ's generic drug investigation.[51]  The company stated that it "received a subpoena in Mar[ch] 2016 requesting non-product specific information."[52]

(c) **Citron**:  In December 2016, Aceto Corporation (which purchased Citron's generic drugs assets) disclosed that DOJ "executed a search warrant against the Company and also served a subpoena requesting documents and other information concerning potential antitrust violations in the sale of Glyburide, Glyburide/Metformin, and Fosinopril HCTZ products."  The Connecticut AG requested that Citron produce all documents produced to DOJ.[53]

(d) **Dr. Reddy's**:  In November 2016, Dr. Reddy's disclosed that it received subpoenas from DOJ and the Connecticut AG "seeking information relating to the marketing, pricing and sale of certain . . . generic products and any communications with competitors about such products."[54]

(e) **Heritage**:  As a private company, Heritage is not required to make public disclosures.  Nonetheless, in the wake of the criminal guilty pleas by two of its executives, Heritage confirmed that it is "fully

---

[50] Allergan, SEC 2015 Form 10-K at F-106 (Feb. 26, 2016), *available at* https://www.sec.gov/Archives/edgar/data/1578845/000156459016013478/agn-10k_20151231.htm.

[51] Zeba Siddiqui, *India's Aurobindo shares hit nine-month low on US price-fixing lawsuit*, Reuters (Dec. 15, 2016), *available at* http://www.reuters.com/article/us-aurobindo-pharm-stocks-idUSKBN1450DV.

[52] Aurobindo, BSE Disclosure (Dec. 16, 2016), *available at* http://www.bseindia.com/xml-data/corpfiling/AttachHis/3C8E03C7_A46F_4792_AED5_197E6961A77E_125855.pdf.

[53] Aceto, SEC Form 8-K, Ex. 99.5, *available at* https://www.sec.gov/Archives/edgar/data/2034/000157104916020771/t1600804_ex99-5.htm.

[54] Dr. Reddy's, SEC Form 6-K at 57 (Dec. 31, 2016), *available at* http://www.drreddys.com/investors/reports-and-filings/sec-filings/?year=FY17.

cooperating" with DOJ[55] and press reports indicate that Heritage has applied to DOJ's leniency program seeking amnesty for a cartel violation.

(f)  **Impax**: In July 2014, Impax disclosed that it received a subpoena from the Connecticut AG concerning sales of generic digoxin.[56]  In November 2014, Impax disclosed that an employee received a broader federal grand jury subpoena that requested testimony and documents about "any communication or correspondence with any competitor (or an employee of any competitor) in the sale of generic prescription medications."[57]  In February 2016, Impax disclosed that it received a DOJ subpoena requesting "information and documents regarding the sales, marketing, and pricing of certain generic prescription medications.  In particular . . .  digoxin tablets, terbutaline sulfate tablets, prilocaine/lidocaine cream, and calcipotriene topical solution."[58]

(g)  **Lannett**: In July 2014, Lannett disclosed that it received a subpoena from the Connecticut AG relating to its investigation into the price-fixing of digoxin.[59]  On November 3, 2014, Lannett disclosed that a Senior Vice President of Sales and Marketing was served with a grand jury subpoena "relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act." The subpoena also requested "corporate documents of the Company relating to communications or correspondence with competitors regarding the sale of generic prescription medications, but is not specifically directed to any particular product and is not limited to any particular time period."[60]  On August 27, 2015, Lannett further explained that DOJ sought, among other things,

---

[55] Tom Schoenberg, David McLaughlin & Sophia Pearson, *U.S. Generic Drug Probe Seen Expanding After Guilty Pleas*, Bloomberg (Dec. 14, 2016), *available at* https://www.bloomberg.com/news/articles/2016-12-14/u-s-files-first-charges-in-generic-drug-price-fixing-probe.

[56] Impax, SEC Form 8-K (July 15, 2014), *available at* https://www.sec.gov/Archives/edgar/data/1003642/000143774914012809/ipxl20140715_8k.htm.

[57] Impax, SEC Form 8-K (Nov. 6, 2014), *available at* https://www.sec.gov/Archives/edgar/data/1003642/000119312514402210/d816555d8k.htm.

[58] Impax, SEC 2015 Form 10-K at 53 (Feb. 22, 2016), *available at* https://www.sec.gov/Archives/edgar/data/1003642/000143774916025780/ipxl20151231_10k.htm.

[59] Lannett, Press Release (July 16, 2014), *available at* http://lannett.investorroom.com/2014-07-16-Lannett-Receives-Inquiry-From-Connecticut-Attorney-General.

[60] Lannett, SEC Form 10-Q at 16 (Nov. 6, 2014), *available at* https://www.sec.gov/Archives/edgar/data/57725/000110465914077456/a14-20842_110q.htm.

**FILED WITH REDACTIONS – PUBLIC VERSION**

"communications or correspondence with competitors regarding the sale of generic prescription medications, and the marketing, sale, or pricing of certain products, generally for the period of 2005 through the dates of the subpoenas."[61]

(h) **Mayne**:  On August 25, 2016, Mayne Pharma Group Limited (the parent of Mayne) disclosed that it was "one of numerous generic pharmaceutical companies to receive a subpoena . . . seeking information relating to marketing, pricing and sales of select generic products" and that it had received a subpoena from the Connecticut AG seeking similar information.[62]  On November 4, 2016, Mayne Pharma Group Limited issued a press release stating: "Previously on 28 Jun[e] 2016, Mayne Pharma Group Limited disclosed that it was one of several generic companies to receive a subpoena from the Antitrust Division of the US Department of Justice (DOJ) seeking information relating to the marketing, pricing and sales of select generic products.  The investigation relating to Mayne Pharma is focused on doxycycline hyclate delayed-release tablets (generic) and potassium chloride powders."[63]

(i) **Mylan**: In February 2016, Mylan disclosed that it received a DOJ subpoena "seeking information relating to . . . generic Doxycycline" and a similar subpoena from the Connecticut AG seeking "information relating to . . . certain of the Company's generic products (including Doxycycline) and communications with competitors about such products."[64]  On Nov. 9, 2016, Mylan disclosed that "certain employees and a member of senior management, received subpoenas from the DOJ seeking additional information relating to the marketing, pricing and sale of our generic Cidofovir, Glipizide-metformin, Propranolol and Verapamil products" and that "[r]elated search warrants also were executed" in connection with DOJ's investigation.[65]

---

[61] Lannett, SEC Form 10-K at 18 (Aug. 27, 2015), *available at* http://www.sec.gov/Archives/edgar/data/57725/000110465915062047/a15-13005_110k.htm.

[62] Mayne, 2016 Annual Report at 75 (Aug. 25, 2016), *available at* https://www.maynepharma.com/media/1788/2016-mayne-pharma-annual-report.pdf.

[63] Mayne, *Update on DOJ Investigation* (Nov. 4, 2016), *available at* http://asxcomnewspdfs.fairfaxmedia.com.au/2016/11/04/01798874-137879061.pdf.

[64] Mylan, SEC 2015 Form 10-K at 160 (Feb. 16, 2016), *available at* https://www.sec.gov/Archives/edgar/data/1623613/000162361316000046/myl10k_20151231xdoc.htm.

[65] Mylan, SEC Form 10-Q at 58 (Nov. 9, 2016), *available at* https://www.sec.gov/Archives/edgar/data/1623613/000162361316000071/myl10q_20160930xdoc.htm.

**FILED WITH REDACTIONS – PUBLIC VERSION**

(j)  **Par**:  In March 2015, Par disclosed that it received subpoenas from the Connecticut AG and DOJ relating to digoxin and doxycycline.[66] In November 2015, Endo International plc, the parent company of Par, elaborated: "In December 2014, our subsidiary, Par, received a Subpoena to Testify Before Grand Jury from the Antitrust Division of the DOJ and issued by the U.S. District Court for the Eastern District of Pennsylvania.  The subpoena requests documents and information focused primarily on product and pricing information relating to Par's authorized generic version of Lanoxin (digoxin) oral tablets and Par's generic doxycycline products, and on communications with competitors and others regarding those products.  Par is currently cooperating fully with the investigation."[67]  Endo also disclosed that in December 2015 it "received Interrogatories and Subpoena Duces Tecum from the State of Connecticut Office of Attorney General requesting information regarding pricing of certain of its generic products, including Doxycycline Hyclate, Amitriptyline Hydrochloride, Doxazosin Mesylate, Methotrexate Sodium and Oxybutynin Chloride."[68]

(k)  **Perrigo**:  On May 2, 2017, Perrigo disclosed that "search warrants were executed at the Company's corporate offices associated with an ongoing investigation by the U.S. Department of Justice Antitrust Division related to drug pricing in the pharmaceutical industry."[69]

(l)  **Pfizer:**   On August 10, 2017, Pfizer disclosed: "As of July 2017, the U.S. Department of Justice's Antitrust Division is investigating our Greenstone generics business. We believe this is related to an ongoing antitrust investigation of the generic pharmaceutical industry. The government has been obtaining information from Greenstone."[70]

---

[66] Par, SEC 2014 Form 10-K at 37 (Mar. 12, 2015), *available at* https://www.sec.gov/Archives/edgar/data/878088/000087808815000002/prx-20141231x10k.htm.

[67] Endo, SEC Form 10-Q at 30 (March 31, 2016), *available at* https://www.sec.gov/Archives/edgar/data/1593034/000159303416000056/endp-3312016x10q.htm.

[68] *Id.* at 31.

[69] Perrigo, Press Release (May 2, 2017), *available at* http://perrigo.investorroom.com/2017-05-02-Perrigo-Discloses-Investigation.

[70] Pfizer, SEC Form 10-Q (Aug. 10, 2017) at 37, *available at* https://investors.pfizer.com/financials/sec-filings/sec-filings-details/default.aspx?FilingId=12225193.

**FILED WITH REDACTIONS – PUBLIC VERSION**

(m) **Sandoz**:  In March 2016, Sandoz and Fougera Pharmaceuticals Inc. (a wholly owned subsidiary of Sandoz) "received a subpoena from the Antitrust Division of the US Department of Justice (DoJ) requesting documents related to the marketing and pricing of generic pharmaceutical products . . . and related communications with competitors."[71]

(n) **Sun**:  On May 27, 2016, Sun Pharmaceutical Industries, Ltd. (the parent of Sun) stated in a filing with the National Stock Exchange of India that one of its U.S subsidiaries, namely Sun, "received a grand jury subpoena from the United States Department of Justice, Antitrust Division seeking documents . . . relating to corporate and employee records, generic pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters."[72]

(o) **Taro**:  In September 2016, Taro disclosed that the Company "and two senior officers" received DOJ subpoenas seeking documents relating to "generic pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters."[73]

(p) **Teva**:  In August 2016, Teva disclosed that it received subpoenas from DOJ and the Connecticut AG seeking documents and other information "relating to the marketing and pricing of certain of Teva USA's generic products and communications with competitors about such products."[74]

(q) **Zydus**:  Press reports have stated the Zydus is a target of DOJ's generic drugs price-fixing investigation.[75]

---

[71] Novartis, 2016 Financial Report at 217 (Jan. 24, 2017), *available at* https://www.novartis.com/sites/www.novartis.com/files/ar-2016-financial-report-en.pdf.

[72] Sun, BSE Disclosure (May 27, 2016), *available at* http://www.bseindia.com/xml-data/corpfiling/AttachHis/8E568708_8D00_472E_B052_666C76A4263D_081648.pdf.

[73] Taro, SEC Form 6-K (Sept. 9, 2016), *available at* https://www.sec.gov/Archives/edgar/data/906338/000115752316006685/a51417528.htm.

[74] Teva, SEC Form 6-K at 25 (Aug. 4, 2016), *available at* https://www.sec.gov/Archives/edgar/data/818686/000119312516671785/d187194d6k.htm

[75] *See* Rupali Mukherjeel, *US polls, pricing pressure may hit Indian pharma cos*, The Times of India (Nov. 8, 2016), *available at* http://timesofindia.indiatimes.com/business/india-business/US-polls-pricing-pressure-may-hit-Indian- pharma-cos/articleshow/55301060.cms.

## VIII.    THE STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS

### A.  The Statutes of Limitations did not begin to run because Plaintiffs did not and could not discover Defendants' unlawful conspiracy

164.    Plaintiffs had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest) Defendants' and other generic drug manufacturers' disclosures of the existence of the government investigations and subpoenas.  Prior to that time, no information in the public domain or available to Plaintiffs suggested that any Defendant was involved in a criminal conspiracy to fix prices for generic Propranolol.

165.    In the case of Heritage, specifically, Plaintiffs had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth against this Defendant, until (at the earliest) the filing of the AG's Complaint and/or the filing of the criminal informations against Glazer and Malek.

166.    No information evidencing antitrust violations was available in the public domain prior to the public announcements of the government investigations that revealed sufficient information to suggest that any of the defendants was involved in a criminal conspiracy to fix prices for generic Propranolol.

167.    Plaintiffs are purchasers who indirectly purchased generic Propranolol manufactured by one or more Defendants.  They had no direct contact or interaction with any of the Defendants in this case and had no means from which they could have discovered Defendants' conspiracy.

168.    Defendants repeatedly and expressly stated throughout the Class Periods, including on their public Internet websites, that they maintained antitrust/fair competition policies which prohibited the type of collusion alleged in this Complaint. For example:

**FILED WITH REDACTIONS – PUBLIC VERSION**

(a)   Allergan's (predecessor to Actavis) Code of Conduct provides: "We support a free and open market, which is why we comply with competition laws everywhere we do business and strive to always compete fairly."[76]

(b)   Esteve Group's (parent of Breckenridge Pharmaceutical) Code of Ethics provides: "At ESTEVE we are committed to complying with the applicable legislation defending competition where we carry out our activities to preserve and protect a free, open market, avoiding behavior that is abusive or restricts competition."  The policy directs employees: "Do not exchange sensitive information with competitors or start conversations that may involve anti-competitive behavior.  Do not reach agreements with competitors that involve, among other forbidden practices, price fixing or allotting markets or clients.  Request advice from the Legal Department should you require answers to any dubious behavior."[77]

(c)   Mylan's Code of Conduct and Business Ethics states: "Mylan is committed to complying with applicable antitrust and fair competition laws."[78]

(d)   Par's Code of Conduct provides: "It is Company policy to comply with the antitrust and competition laws of each country in which the Company does business."[79]

(e)   Teva's Code of Conduct provides: "We believe that customers and society as a whole benefit from fair, free and open markets. Therefore, we compete on the merits of our products and services and conduct business with integrity. We recognize that the potential harm to Teva's reputation and the penalties for breaching competition laws are severe, and can subject Teva, members of the Board of Directors and employees to severe civil fines and criminal penalties."[80]

---

[76] Allergan Code of Conduct, *available at* http://www.allergan.com/investors/corporate-governance/code-of-conduct.

[77] Esteve Group Code of Ethics, *available at* http://archivosweb.esteve.com/rsc/en/ethical-code.pdf.

[78] Mylan Code of Business Conduct and Ethics, *available at* https://www.mylan.com/-/media/mylancom/files/code%20of%20business%20conduct%20and%20ethics.pdf.

[79] Par Code of Ethics, *available at* http://corpdocs.msci.com/ethics/eth_19100.pdf.

[80] Teva Code of Conduct, *available at* http://www.tevapharm.com/files/about/corporate_governance/code_of_conduct/TEVA_CodeOf Conduct_FINAL_111715%5B2%5D.pdf.

FILED WITH REDACTIONS – PUBLIC VERSION

      (f)    Upsher-Smith's Code of Conduct provides: "Upsher-Smith is committed to fair and open competition. Employees of Upsher-Smith are expected to conduct business in compliance with all applicable laws regulating competition and must not knowingly engage in any anti-competitive activity."[81]

169.    It was reasonable for members of the Classes to believe that Defendants were complying with their own antitrust policies.

170.    For these reasons, the statutes of limitations as to Plaintiffs' claims under the federal and state common laws identified herein did not begin to run, and have been tolled with respect to the claims that Plaintiffs have alleged in this Complaint.

**B.    Fraudulent concealment tolled the Statutes of Limitations**

171.    In the alternative, application of the doctrine of fraudulent concealment tolled the statutes of limitations on the claims asserted by Plaintiffs. Plaintiffs had no knowledge of the combination or conspiracy alleged in this Complaint, or of facts sufficient to place them on inquiry notice of their claims, until Defendants disclosed the existence of government investigations and subpoenas. Prior to that time, no information in the public domain or available to Plaintiffs suggested that any Defendant was involved in a criminal conspiracy to fix prices for generic Propranolol.

172.    In the case of Heritage, Plaintiffs had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth against these Defendants, until (at the earliest) the filing of the AG's Complaint and/or the filing of the criminal Informations against Glazer and Malek.

---

[81] Upsher-Smith Code of Conduct, *available at* http://www.upsher-smith.com/wp-content/uploads/USL_CodeOfConduct.pdf.

173.    No information evidencing antitrust violations was available in the public domain prior to the public announcements of the government investigations that revealed sufficient information to suggest that any of the defendants was involved in a criminal conspiracy to fix prices for generic Propranolol.

174.    As described in more detail below, Defendants actively concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Classes concerning Defendants' unlawful activities to artificially inflate prices for generic Propranolol.  The concealed, suppressed, and omitted facts would have been important to Plaintiffs and members of the Classes as they related to the cost of generic Propranolol they purchased.  Defendants misrepresented the real cause of price increases and/or the absence of price reductions in generic Propranolol.  Defendants' false statements and conduct concerning the prices of generic Propranolol were deceptive as they had the tendency or capacity to mislead Plaintiffs and members of the Classes to believe that they were purchasing generic Propranolol at prices established by a free and fair market.

### 1.    Active concealment of the conspiracy

175.    Defendants engaged in an illegal scheme to fix prices, allocate customers and rig bids. Criminal and civil penalties for engaging in such conduct are severe.  Not surprisingly, Defendants took affirmative measures to conceal their conspiratorial conduct.

176.    Through their misleading, deceptive, false and fraudulent statements, Defendants effectively concealed their conspiracy, thereby causing economic harm to Plaintiffs and the Classes.  Defendants' misrepresentations regarding their price changes were intended to lull Plaintiffs and the Classes into accepting the price hikes as a normal result of competitive and economic market trends rather than as the consequence of Defendants' collusive acts.  The public

statements made by Defendants were designed to mislead Plaintiffs and the Classes into paying unjustifiably higher prices for generic Propranolol.

177.    As explained in the State AG complaint, the nature of the generic drug industry—which allows for frequent and repeated face-to-face meetings among competitors—means that "Most of the conspiratorial communications were intentionally done in person or by cell phone, in an attempt to avoid creating a record of their illegal conduct.  The generic drug industry, through the aforementioned opportunities to collude at trade shows, customer events and smaller more intimate dinners and meetings, allowed these communications to perpetuate."[82]

178.    The Defendants also gave pretextual reasons for price increases.  For example:

(a)    Mylan's parent company, Mylan N.V., stated in documents filed with the SEC in 2015 that "[t]he pharmaceutical industry is highly competitive" and that it "face[s] vigorous competition from other pharmaceutical manufacturers that threatens the commercial acceptance and pricing of our products."[83]

(b)    Teva stated in a Q4 2015 earnings call on February 11, 2016: "There is a lot of competition in the U.S., there is no question about it. As you well know, there is [sic] over 200 generic competitors in the U.S. market and the competition is fierce."

179.    These types of false statements and others made by Defendants helped conceal the illegal conspiracy entered into by Defendants to fix, stabilize, maintain and raise the price of generic Propranolol to inflated, supracompetitive levels.

---

[82] State AG Compl. ¶ 13.
[83] Mylan, SEC Form 10-Q at 76 (May 8, 2015), *available at* http://investor.mylan.com/secfiling.cfm?filingID=1623613-15-9&CIK=1623613.

FILED WITH REDACTIONS – PUBLIC VERSION

## 2.      Plaintiffs exercised reasonable diligence

180.    Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Generic drugs are not exempt from antitrust regulation, and thus, before the disclosure of the government investigations, Plaintiffs reasonably considered the markets to be competitive. Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of Defendants' prices before these disclosures.

181.    Because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to conceal their illicit conduct, Plaintiffs and the Classes could not have discovered the conspiracy at an earlier date by the exercise of reasonable diligence.

182.    Therefore, the running of any statutes of limitations has been tolled for all claims alleged by Plaintiffs and the Classes as a result of Defendants' anticompetitive and unlawful conduct.  Despite the exercise of reasonable diligence, Plaintiffs and Members of the Classes were unaware of Defendants' unlawful conduct, and did not know that they were paying supracompetitive prices throughout the United States during the Class Periods.

183.    For these reasons, Plaintiffs' claims are timely under all of the federal, state and common laws identified herein.

## IX.      <u>CONTINUING VIOLATIONS</u>

184.    This Complaint alleges a continuing course of conduct (including conduct within the limitations periods), and defendants' unlawful conduct has inflicted continuing and accumulating harm within the applicable statutes of limitations.  Thus, Plaintiffs and the members of the Damages Classes can recover for damages that they suffered during any applicable limitations period.

**FILED WITH REDACTIONS – PUBLIC VERSION**

## X.   DEFENDANTS' ANTITRUST VIOLATIONS

185.   During the Class Periods, set forth below, Defendants engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to allocate customers, rig bids, and fix raise and/or stabilize prices for generic Propranolol sold in the United States.

186.   In formulating and effectuating the contract, combination or conspiracy, Defendants identified above and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to allocate customers, rig bids and artificially fix, raise, maintain, and/or stabilize the price of generic Propranolol sold in the United States.  These activities included the following:

(a)   Defendants participated in meetings and/or conversations regarding the price of generic Propranolol in the United States;

(b)   Defendants agreed during those meetings and conversations to charge prices at specified levels and otherwise to increase and/or maintain prices of generic Propranolol sold in the United States;

(c)   Defendants agreed during those meetings and conversations to allocate customers, rig bids, and fix the price of generic Propranolol; and

(d)   Defendants issued price announcements and price quotations in accordance with their agreements.

187.   Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in this Complaint.

188.   During and throughout the period of the conspiracy alleged in this Complaint, Plaintiffs and members of the Classes purchased generic Propranolol at inflated and supracompetitive prices.

189.   Defendants' contract, combination and conspiracy constitutes an unreasonable restraint of trade and commerce in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and the laws of various IRP Damages Jurisdictions enumerated below.

FILED WITH REDACTIONS – PUBLIC VERSION

190.    As a result of Defendants' unlawful conduct, Plaintiffs and the other members of the Classes have been injured in their business and property in that they have paid more for generic Propranolol than they would have paid in a competitive market.

191.    General economic principles recognize that any overcharge at a higher level of distribution generally results in higher prices at every level below.  Moreover, the institutional structure of pricing and regulation in the pharmaceutical drug industry assures that overcharges at the higher level of distribution are passed on to Plaintiffs.  Wholesalers and retailers passed on the inflated prices to Plaintiffs and members of the Classes.  The impairment of generic competition at the direct purchaser level similarly injured Plaintiffs who were equally denied the opportunity to purchase less expensive generic versions of Propranolol.

192.    The unlawful contract, combination and conspiracy has had the following effects, among others:

    (a)   price competition in the market for generic Propranolol has been artificially restrained;

    (b)   prices for generic Propranolol sold by Defendants have been raised, fixed, maintained, or stabilized at artificially high and non-competitive levels; and

    (c)   independent pharmacy purchasers of generic Propranolol sold by Defendants have been deprived of the benefit of free and open competition in the market for generic Propranolol.

## XI.    CLASS ACTION ALLEGATIONS

193.    Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following two classes (the "Nationwide Classes"):

    (a)   **Capsules Nationwide Class:**  All privately held pharmacies in the United States and its territories that purchased

Defendants' generic Propranolol capsules from March 1, 2013 through the present.

(b) **Tablets Nationwide Class:**  All privately held pharmacies in the United States and its territories that purchased Defendants' generic Propranolol tablets from December 1, 2014 through the present.

(c) These classes exclude: (a) defendants, their officers, directors, management, employees, subsidiaries and affiliates; (b) any pharmacies owned in part by judges or justices involved in this action or any members of their immediate families; (c) all pharmacies owned or operated by publicly traded companies.

194.    Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the common law of unjust enrichment and the state antitrust, unfair competition, and consumer protection laws of the states and territories listed below (the "IRP Damages Jurisdictions")[84] on behalf of the following two classes (the "Damages Classes"):

(a) **Capsules Damages Class:**  All privately held pharmacies in the IRP Damages Jurisdictions that purchased Defendants' generic Propranolol capsules from March 2013 through the present.

(b) **Tablets Damages Class:**  All privately held pharmacies in the IRP Damages Jurisdictions that purchased Defendants' generic Propranolol tablets from December 2014 through the present.

(c) These classes exclude:   (a) defendants, their officers, directors, management, employees, subsidiaries and affiliates; (b) any pharmacies owned in part by judges or justices involved in this action or any members of their immediate families; (c) all pharmacies owned or operated by publicly traded companies.

---

[84] The "IRP Damages Jurisdictions" consist of: all States (except Hawaii, Indiana and Ohio), as well as the District of Columbia, Puerto Rico and the U.S. Virgin Islands.

**FILED WITH REDACTIONS – PUBLIC VERSION**

195.    The Nationwide Classes and the Damages Classes are referred to herein as the "Classes."

196.    While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are thousands of members in each Class.

197.    Common questions of law and fact exist as to all members of the Classes.  This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members the Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

(a)    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize prices of generic Propranolol and/or engaged in market allocation for generic Propranolol sold in the United States;

(b)    The identity of the participants of the alleged conspiracy;

(c)    The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)    Whether the alleged conspiracy violated the Sherman Act, as alleged in the First and Second Counts;

(e)    Whether the alleged conspiracy violated state antitrust and unfair competition laws, and/or state consumer protection laws, as alleged in the Third and Fourth Counts;

(f)    Whether Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fifth Count;

(g)    Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

(h)    The effect of the alleged conspiracy on the prices of generic Propranolol sold in the United States during the Class Periods;

**FILED WITH REDACTIONS – PUBLIC VERSION**

(i)   Whether the Defendants and their co-conspirators actively concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Classes concerning Defendants' unlawful activities to artificially inflate prices for generic Propranolol, and/or fraudulently concealed the unlawful conspiracy's existence from Plaintiffs and the other members of the Classes;

(j)   The appropriate injunctive and related equitable relief for the Nationwide Classes; and

(k)   The appropriate class-wide measure of damages for the Damages Classes.

198.   Plaintiffs' claims are typical of the claims of the members of the Classes. Plaintiffs and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for generic Propranolol purchased indirectly from Defendants and/or their co-conspirators. Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.

199.   Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

200.   The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

201.   Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual

actions would engender.   The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

202.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## XII.    CAUSES OF ACTION

### FIRST COUNT

**Violation of Sections 1 and 3 of the Sherman Act**
**(on behalf of Plaintiffs and the Nationwide Class)**

207.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

208.    Defendants and their unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. § 1, 3).

209.    During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially allocate customers, rig bids and raise, maintain and fix prices for generic Propranolol, thereby creating anticompetitive effects.

210.    The conspiratorial acts and combinations have caused unreasonable restraints in the market for generic Propranolol.

FILED WITH REDACTIONS – PUBLIC VERSION

211.    As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated independent pharmacies in the Nationwide Class who purchased generic Propranolol have been harmed by being forced to pay inflated, supracompetitive prices for generic Propranolol.

212.    In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth herein.

213.    Defendants' conspiracy had the following effects, among others:

(a)    Price competition in the market for generic Propranolol has been restrained, suppressed, and/or eliminated in the United States;

(b)    Prices for generic Propranolol provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

(c)    Plaintiffs and members of the Nationwide Class who purchased generic Propranolol indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

214.    Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for generic Propranolol purchased indirectly from Defendants and the co-conspirators than they would have paid and will pay in the absence of the conspiracy.

215.    Defendants' contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

216.    Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the continuing violations alleged herein.

FILED WITH REDACTIONS – PUBLIC VERSION

**SECOND COUNT**

**Violation of Sections 1 and 3 of the Sherman Act**
**(on behalf of Plaintiff Falconer and the Damages Class for purchases made directly from**
**Defendants)**

217.     Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

218.     As a result of Defendants' unlawful conduct in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. § 1, 3), Plaintiff Falconer Pharmacy and other similarly situated pharmacies in the Damages Class who made direct purchases of Propranolol from Teva (or from any other Defendants found to have sold directly to pharmacies) were forced to pay inflated, supracompetitive prices for generic Propranolol.

219.     Plaintiff Falconer Pharmacy and members of the Damages Class who made such direct purchases seek treble damages for those purchases, and the cost of suit, including reasonable attorney's fees, as per 15 U.S.C. § 15(a).

**THIRD COUNT**

**Violation of State Antitrust Statutes[85]**
**(on behalf of Plaintiffs and the Damages Class)**

220.     Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

221.     During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of generic Propranolol in

---

[85] Statutory antitrust violations are alleged herein for the following jurisdictions: Alabama, Arizona, California, Connecticut, District of Columbia, ~~Illinois~~, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia and Wisconsin.

**FILED WITH REDACTIONS – PUBLIC VERSION**

unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

222.    The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain the prices of generic Propranolol and to allocate customers for generic Propranolol in the United States.

223.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

> (a)    participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price generic Propranolol at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to generic Propranolol provided in the United States; and

> (b)    participating in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

224.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreement to allocate customers, rig bids, and fix prices for generic Propranolol. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

225.    In addition, defendants have profited significantly from the conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of plaintiffs and the members of the Damages Class.

226.    Accordingly, plaintiffs and the members of the Damages Class in each of the following jurisdictions seek damages (including statutory damages where applicable), to be trebled

or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the following state laws.

227.    Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the following state antitrust statutes:

228.    **Alabama:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Alabama Code § 6-5-60, et seq. Defendants' combinations and conspiracy had the following effects: (1) price competition for generic Propranolol was restrained, suppressed, and eliminated throughout Alabama; (2) generic Propranolol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Alabama. During the Class Period, Defendants' illegal conduct substantially affected Alabama commerce. By reason of the foregoing, Defendants entered into an agreement in restraint of trade in violation of Alabama Code § 6-5-60, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Alabama Code § 6-5-60, et seq.

229.    **Arizona:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Arizona Revised Statutes, § 44-1401, et seq. Defendants' combination and conspiracy had the following effects: (1) price competition for generic Propranolol was restrained, suppressed, and eliminated throughout Arizona; (2) generic Propranolol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce. Defendants' violations of Arizona law were flagrant.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into an agreement in restraint of trade in violation of Ariz. Rev. Stat. § 44-1401, et seq. Accordingly,

Plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. § 44-1401, et seq.

230.    **California:** Defendants have entered into an unlawful agreement in restraint of trade in violation of California Business and Professions Code § 16700 et seq. During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of California Business and Professions Code §16720. Defendants, and each of them, have acted in violation of § 16720 to fix, raise, stabilize, and maintain prices of generic Propranolol at supracompetitive levels. The aforesaid violations of § 16720 consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of generic Propranolol. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth above and creating a price floor, fixing, raising, and stabilizing the price of generic Propranolol. The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (1) price competition for generic Propranolol has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for generic Propranolol provided by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California; and (3) those who purchased generic Propranolol indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property in that they paid more for generic Propranolol than they otherwise would have paid in the

absence of Defendants' unlawful conduct. During the Class Period, Defendants' illegal conduct substantially affected California commerce. As a result of Defendants' violation of § 16720, Plaintiffs and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to California Business and Professions Code § 16750(a).

231.   **District of Columbia:** Defendants have entered into an unlawful agreement in restraint of trade in violation of District of Columbia Code Annotated § 28-4501, et seq. Defendants' combination and conspiracy had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) generic Propranolol prices were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic Propranolol in the District of Columbia that were shipped by Defendants or their co-conspirators into the District of Columbia, were deprived of free and open competition, including in the District of Columbia; and (4) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic Propranolol in the District of Columbia that were shipped by Defendants or their co-conspirators, paid supracompetitive, artificially inflated prices for generic Propranolol, including in the District of Columbia. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of District of Columbia Code Ann. § 28-4501, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. § 28-4501, et seq.

FILED WITH REDACTIONS – PUBLIC VERSION

232.   **Illinois:** ~~Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, et seq.) Defendants' combination or conspiracy had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout Illinois; (2) generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under the Illinois Antitrust Act.~~[86]

233.   **Iowa:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code § 553.1, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout Iowa; (2) generic Propranolol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Iowa Code § 553.1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code § 553, et seq.

234.   **Kansas:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Kansas Statutes Annotated, § 50-101, et seq. Defendants' combined capital, skills

---

[86] Plaintiffs acknowledge that this claim was dismissed with prejudice by the Court's February 15, 2019 Order (16-md-2724 Dkt. 858) and reassert the claim here solely for purposes of preservation for appeal.

or acts for the purposes of creating restrictions in trade or commerce of generic Propranolol, increasing the prices of generic Propranolol, preventing competition in the sale of generic Propranolol, or binding themselves not to sell generic Propranolol, in a manner that established the price of generic Propranolol and precluded free and unrestricted competition among themselves in the sale of generic Propranolol, in violation of Kan. Stat. Ann. § 50-101, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout Kansas; (2) generic Propranolol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Kansas. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Kansas Stat. Ann. § 50-101, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. § 50-101, et seq.

235.    **Maine:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Maine Revised Statutes (Maine Rev. Stat. Ann. 10, § 1101, et seq.) Defendants' combination or conspiracy had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout Maine; (2) generic Propranolol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maine. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Maine Rev. Stat. Ann. 10, § 1101, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, § 1101, et seq.

236.   **Michigan:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Michigan Compiled Laws Annotated § 445.771, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout Michigan; (2) generic Propranolol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Michigan Comp. Laws Ann. § 445.771, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. § 445.771, et seq.

237.   **Minnesota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Minnesota Annotated Statutes § 325D.49, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) generic Propranolol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Minnesota Stat. § 325D.49, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. § 325D.49, et seq.

FILED WITH REDACTIONS – PUBLIC VERSION

238. **Mississippi:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Mississippi Code Annotated § 75-21-1, et seq. Trusts are combinations, contracts, understandings or agreements, express or implied when inimical to the public welfare and with the effect of, *inter alia*, restraining trade, increasing the price or output of a commodity, or hindering competition in the production and sale of a commodity. Miss. Code Ann. § 75-21-1. Defendants' combination or conspiracy was in a manner inimical to public welfare and had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) generic Propranolol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Mississippi Code Ann. § 75-21-1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. § 75-21-1, et seq.

239. **Nebraska:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Nebraska Revised Statutes § 59-801, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) generic Propranolol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing,

Defendants have entered into an agreement in restraint of trade in violation of Nebraska Revised Statutes § 59-801, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes § 59-801, et seq.

240.    **Nevada:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Nevada Revised Statutes Annotated § 598A.010, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout Nevada; (2) generic Propranolol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada. During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Nevada Rev. Stat. Ann. § 598A.010, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. § 598A.010, et seq.

241.    **New Hampshire:** Defendants have entered into an unlawful agreement in restraint of trade in violation of New Hampshire Revised Statutes § 356:1, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) generic Propranolol prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in

restraint of trade in violation of New Hampshire Revised Statutes § 356:1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes § 356:1, et seq.

242.    **New Mexico:** Defendants have entered into an unlawful agreement in restraint of trade in violation of New Mexico Statutes Annotated § 57-1-1, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) generic Propranolol prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New Mexico Stat. Ann. § 57-1-1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Stat. Ann. § 57-1-1, et seq.

243.    **New York:** Defendants have entered into an unlawful agreement in restraint of trade in violation of New York General Business Law § 340, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout New York; (2) generic Propranolol prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York that were higher than they would have been absent Defendants' illegal acts. During the Class Period, Defendants' illegal conduct substantially affected New York commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing,

Defendants have entered into an agreement in restraint of trade in violation of New York General Business Law § 340, et seq. The conduct set forth above is a per se violation of the Act. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law § 340, et seq.

244.    **North Carolina:** Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes § 75-1, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) generic Propranolol prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina. During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of North Carolina Gen. Stat. § 75-1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina Gen. Stat. § 75-1, et. seq.

245.    **North Dakota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of North Dakota Century Code § 51-08.1-01, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) generic Propranolol prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further

injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of North Dakota Cent. Code § 51-08.1-01, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Dakota Cent. Code § 51-08.1-01, et seq.

246.    **Oregon:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Oregon Revised Statutes § 646.705, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout Oregon; (2) generic Propranolol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon. During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Oregon Revised Statutes § 646.705, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Oregon Revised Statutes § 646.705, et seq.

247.    **Rhode Island:** Defendants have entered into an unlawful agreement in restraint of trade in violation of the Rhode Island Antitrust Act, Rhode Island General Laws § 6-36-1, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) generic Propranolol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Rhode Island. During the Class Period, Defendants' illegal conduct had a substantial effect on Rhode Island commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and

property on or after July 15, 2013, and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Rhode Island General Laws § 6-36-1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Rhode Island General Laws § 6-36-1, et seq.

248.    **South Dakota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of South Dakota Codified Laws § 37-1-3.1, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) generic Propranolol prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota. During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of South Dakota Codified Laws Ann. § 37-1-3.1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. § 37-1-3.1, et seq.

249.    **Tennessee:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Tennessee Code Annotated § 47-25-101, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) generic Propranolol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee. During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages

Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Tennessee Code Ann. § 47-25-101, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tennessee Code Ann. § 47-25-101, et seq.

250.    **Utah:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout Utah; (2) generic Propranolol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Utah. During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Utah Code Annotated § 76-10-3101, et seq.

251.    **Vermont:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Vermont Stat. Ann. 9 § 2453, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout Vermont; (2) generic Propranolol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing,

Defendants have entered into an agreement in restraint of trade in violation of Vermont Stat. Ann. 9 § 2453, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 § 2453, et seq.

252. **West Virginia:** Defendants have entered into an unlawful agreement in restraint of trade in violation of West Virginia Code § 47-18-1, et seq. Defendants' anticompetitive acts described above were knowing, willful, and constitute violations or flagrant violations of West Virginia Antitrust Act. Defendants' combination or conspiracy had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) generic Propranolol prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia. During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of West Virginia Code § 47-18-1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia Code § 47-18-1, et seq.

253. **Wisconsin:** Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes § 133.01, et seq. Defendants' and their co-conspirators' anticompetitive activities have directly, foreseeably and proximately caused injury to Plaintiffs and members of the Classes in the United States. Specifically, Defendants' combination or conspiracy had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) generic Propranolol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin.  During the Class

FILED WITH REDACTIONS – PUBLIC VERSION

Period, Defendants' illegal conduct had a substantial effect on the people of Wisconsin and Wisconsin commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Wisconsin Stat. § 133.01, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. § 133.01, et seq.

253a. **Connecticut:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Conn. Gen. Stat. § 35-26 and § 35-28. Defendants' combination or conspiracy described above had the following effects during the class period: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout Connecticut; (2) generic Propranolol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Connecticut. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property on or after July 10, 2017, and are threatened with further injury. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Conn. Gen. Stat. § 35-34 and § 35-35. Plaintiffs have provided a copy of this complaint to the Attorney General as required by Conn. Gen. Stat. § 35-37.

253b. **Maryland:** Defendants have "unreasonably restrain[ed] trade" by "contract, combination or conspiracy" in violation of Md. Code, Com. Law § 11-204(a)(1). During the class period, throughout Maryland, Defendants' combination or conspiracy restrained, suppressed, and eliminated price competition for generic Propranolol and raised, fixed, maintained, and stabilized generic Propranolol prices at artificially high levels. As a direct and proximate result of

Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property on or after October 1, 2017, and are threatened with further injury. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Md. Code, Com. Law § 11-209(b).

254.    **As to All Jurisdictions Above:** Plaintiffs and members of the Damages Class in each of the above jurisdictions have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement. Plaintiffs and members of the Damages Class have paid more for generic Propranolol than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

255.    In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiffs and members of the Damages Class.

256.    Accordingly, Plaintiffs and members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

## FOURTH COUNT

FILED WITH REDACTIONS – PUBLIC VERSION

**Violation of State Consumer Protection Statutes[87]**
**(on behalf of Plaintiffs and the Damages Class)**

257.     Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

258.     Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

259.     **Alaska:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Alaska Statute § 45.50.471, et seq.  Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Propranolol were sold, distributed, or obtained in Alaska and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Alaska law.  Defendants' unlawful conduct had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout Alaska; (2) generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Alaska. During the Class Period, Defendants' illegal conduct substantially affected Alaska commerce and consumers. Defendants have engaged in unfair competition or unfair or

---

[87] Statutory consumer protection / deceptive trade violations are alleged herein for the following jurisdictions: Alaska, Arkansas, California, Colorado, Delaware, Florida, ~~Georgia, Michigan,~~ Minnesota, Nebraska, ~~Nevada,~~ New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, ~~South Carolina,~~ South Dakota, ~~West Virginia,~~ Wisconsin and the U.S. Virgin Islands.

**FILED WITH REDACTIONS – PUBLIC VERSION**

deceptive acts or practices in violation of Alaska Stat. § 45.50.471, et seq., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

260.   **Arkansas:** Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101, et seq. Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Propranolol were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. Defendants Actavis, Breckenridge, Heritage, Impax, Mylan, and Par increased prices of Propranolol, a medical supply, by 10% or more during the 30 days following a declaration of a state of emergency in Arkansas, in violation of A.C.A. § 4-88-303 *et seq.*[88] The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10). Defendants' unlawful conduct had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas. During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-

---

[88] States of emergency for Arkansas were declared on at least January 3, 2013; February 3, 2013; January 17, 2014; April 28, 2014; and February 18, 2015.

FILED WITH REDACTIONS – PUBLIC VERSION

88-107(a)(10) and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

261. **California:** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, et seq. During the Class Period, Defendants manufactured, marketed, sold, or distributed generic Propranolol in California, and committed and continue to commit acts of unfair competition, as defined by § 17200, et seq. of the California Business and Professions Code, by engaging in the acts and practices specified above. This claim is instituted pursuant to §§ 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated § 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law. Defendants' conduct as alleged herein violated § 17200. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code §17200, et seq., including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of § 16720, et seq. of the California Business and Professions Code, set forth above. Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of § 16720, et seq. of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent; (3) Defendants' acts or practices are unfair to purchasers of generic Propranolol in the State of California within the meaning of § 17200, California Business and Professions Code; and (4) Defendants' acts and practices are fraudulent

FILED WITH REDACTIONS – PUBLIC VERSION

or deceptive within the meaning of Section 17200 of the California Business and Professions Code. Further, Defendants Actavis, Breckenridge, Upsher-Smith, Heritage, Impax, Mylan, and Par unlawfully raised prices of Propranolol, a medical supply, by more than 10% during the 30 days following a declaration of a state of emergency in California, in violation of the California Penal Code § 396, thereby committing "unlawful" and "unfair" prohibited business practices under § 17200.[89] Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that have been obtained by Defendants as a result of such business acts or practices. During the Class Period, Defendants' illegal conduct substantially affected California commerce and consumers. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future. The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and members of the Damages Class to pay supracompetitive and artificially-inflated prices for generic Propranolol. Plaintiffs and members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition. The conduct of Defendants as alleged in this Complaint violates § 17200 of the California Business and Professions Code. As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings,

---

[89] States of Emergency for California were declared on at least: August 22, 2012; July 12, 2013; August 22, 2013; August 23, 2013; September 20, 2013; September 30, 2013; October 31, 2013; January 17, 2014; April 29, 2014; May 14, 2014; August 2, 2014; August 24, 2014; September 17, 2014; December 22, 2014; May 19, 2015; May 20, 2015; July 31, 2015; September 11, 2015; September 13, 2015; December 18, 2015; February 1, 2016; February 19, 2016; April 19, 2016; June 7, 2016; June 24, 2016; July 26, 2016; July 9, 2016; and August 16, 2016.

profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, §§17203 and 17204.

262.   **Colorado:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Colorado Consumer Protection Act, Colorado Rev. Stat. § 6-1-101, et seq. Defendants engaged in an unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiffs as actual or potential consumers of the Defendants' goods and which caused Plaintiffs to suffer injury. Defendants took efforts to conceal their agreements from Plaintiffs. Defendants' unlawful conduct had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout Colorado; (2) generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Colorado. During the Class Period, Defendants' illegal conduct substantially affected Colorado commerce and consumers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colorado Rev. Stat. § 6-1-101, et seq., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute and as equity demands.

263.   **Delaware:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Delaware Consumer Fraud Act, 6 Del. Code § 2511, et seq. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Delaware, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Propranolol were sold, distributed, or obtained in Delaware. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Propranolol. Defendants misrepresented to all purchasers during the Class Period that

Defendants' generic Propranolol prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout Delaware; (2) generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Delaware. During the Class Period, Defendants' illegal conduct had a substantial effect on Delaware commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Propranolol, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Propranolol at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of 6 Del. Code § 2511, et seq., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

264.    **Florida:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, et seq. Defendants' unlawful conduct had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout Florida; (2) generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida. During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers. Defendants have engaged in unfair competition or unfair or

deceptive acts or practices in violation of Florida Stat. § 501.201, et seq., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

~~265.   **Georgia:**  Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Georgia Uniform Deceptive Trade Practices Act, Georgia Code § 10-1-370, et seq.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in Georgia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Propranolol were sold, distributed, or obtained in Georgia. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Propranolol. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Propranolol prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout Georgia; (2) generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Georgia. During the Class Period, Defendants' illegal conduct had a substantial effect on Georgia commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above and are threatened with further injury. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Propranolol, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Propranolol at prices set by a free and fair market. Defendants' misleading conduct and~~

unconscionable activities constitute violations of Georgia Code § 10-1-370, et seq., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.[90]

266.  **Michigan:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Michigan Consumer Protection Statute, Mich. Compiled Laws § 445.903, et seq. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Michigan, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Propranolol were sold, distributed, or obtained in Michigan. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Propranolol. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Propranolol prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout Michigan; (2) generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan. During the Class Period, Defendants' illegal conduct had a substantial effect on Michigan commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and

---

[90] Plaintiffs acknowledge that this claim was dismissed with prejudice by the Court's February 15, 2019 Order (16-md-2724 Dkt. 858) and reassert the claim here solely for purposes of preservation for appeal.

**FILED WITH REDACTIONS – PUBLIC VERSION**

~~omissions concerning the price of generic Propranolol, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Propranolol at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Mich. Compiled Laws § 445.903, et seq., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.~~

267. **Minnesota:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, et seq. Defendants engaged in an unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiffs as actual or potential consumers of the Defendants' goods and which caused Plaintiffs to suffer injury. Defendants took efforts to conceal their agreements from Plaintiffs. Defendants' unlawful conduct had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce and consumers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325D.43, et seq., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute and as equity demands.

268. **Nebraska:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, et seq. Defendants' unlawful conduct had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) generic Propranolol prices were raised, fixed, maintained, and stabilized at

artificially high levels throughout Nebraska. During the Class Period, Defendants marketed, sold, or distributed generic Propranolol in Nebraska, and Defendants' illegal conduct substantially affected Nebraska commerce and consumers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, et seq., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

269.    **Nevada:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0903, et seq. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Nevada, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Propranolol were sold, distributed, or obtained in Nevada. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Propranolol. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Propranolol prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout Nevada; (2) generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada. During the Class Period, Defendants' illegal conduct had a substantial effect on Nevada commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including

~~their affirmative misrepresentations and omissions concerning the price of generic Propranolol, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Propranolol at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Nev. Rev. Stat. § 598.0903, et seq., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.~~

270.   **New Hampshire:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, et seq. Defendants' unlawful conduct had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire. During the Class Period, Defendants marketed, sold, or distributed generic Propranolol in New Hampshire, and Defendants' illegal conduct substantially affected New Hampshire commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1, et seq., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

271.   **New Jersey:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Jersey Consumer Fraud Act, N.J. Statutes § 56:8-1, et seq. Defendants agreed to, and did in fact, act in restraint of trade or commerce in New Jersey, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Propranolol were sold, distributed, or obtained

in New Jersey. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Propranolol. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Propranolol prices were competitive and fair. Defendants Actavis, Breckenridge, and Upsher-Smith raised prices of Propranolol, which is "used to preserve, protect, or sustain the life, health, safety or comfort of persons," by more than 10% within 30 days of the termination of a state of emergency in New Jersey, in violation of N.J. Statutes § 56:8-107 *et seq.*[91] Defendants' unlawful conduct had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout New Jersey; (2) generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Jersey. During the Class Period, Defendants' illegal conduct had a substantial effect on New Jersey commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Propranolol, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Propranolol at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities

---

[91] States of emergency for New Jersey were declared on at least October 27, 2012; October 28, 2012; February 11, 2013; January 2, 2013; January 21, 2014; November 26, 2014; December 23, 2014; January 26, 2015; and March 4, 2015; and January 22, 2016.

constitute violations of N.J. Statutes § 56:8-1, et seq., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

272.   **New Mexico:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, et seq. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Propranolol were sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable trade practices," in violation of N.M.S.A. Stat. § 57-12-3, in that such conduct, *inter alia*, resulted in a gross disparity between the value received by Plaintiffs and members of the Damages Class and the prices paid by them for generic Propranolol as set forth in N.M.S.A., § 57-12-2E. Plaintiffs and members of the Damages Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. Defendants had the sole power to set that price, and Plaintiffs and members of the Damages Class had no power to negotiate a lower price. Moreover, Plaintiffs and members of the Damages Class lacked any meaningful choice in purchasing generic Propranolol because they were unaware of the unlawful overcharge, and there was no alternative source of supply through which Plaintiffs and members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of generic Propranolol, including their illegal conspiracy to secretly fix the price of generic Propranolol at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs and members of the Damages Class. The suppression of competition that

has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for generic Propranolol. Defendants' unlawful conduct had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, et seq., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

273. **New York:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, et seq. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generic Propranolol were sold, distributed or obtained in New York and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. Defendants and their co-conspirators made public statements about the prices of generic Propranolol that either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for generic Propranolol; and Defendants alone possessed material information that was relevant to consumers, but failed to provide the information. Because of Defendants' unlawful trade practices in the State of New

York, New York class members who indirectly purchased generic Propranolol were misled to believe that they were paying a fair price for generic Propranolol or the price increases for generic Propranolol were for valid business reasons; and similarly situated consumers were affected by Defendants' conspiracy. Defendants knew that their unlawful trade practices with respect to pricing generic Propranolol would have an impact on New York consumers and not just Defendants' direct customers. Defendants knew that their unlawful trade practices with respect to pricing generic Propranolol would have a broad impact, causing consumer class members who indirectly purchased generic Propranolol to be injured by paying more for generic Propranolol than they would have paid in the absence of Defendants' unlawful trade acts and practices. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of consumers in New York State in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout New York; (2) generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York. During the Class Period, Defendants marketed, sold, or distributed generic Propranolol in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers. During the Class Period, each of Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic Propranolol in New York. Plaintiffs and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

FILED WITH REDACTIONS – PUBLIC VERSION

274.   **North Carolina:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, et seq. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generic Propranolol were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation and maintenance of Defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions, of which Plaintiffs and members of the Damages Class could not possibly have been aware. Defendants and their co-conspirators publicly provided pretextual and false justifications regarding their price increases. Defendants' public statements concerning the price of generic Propranolol created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by Defendants' illegal conspiracy. Moreover, Defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to outsiders. Defendants Actavis, Breckenridge, Upsher-Smith, Heritage, Impax, Mylan, and Par charged "unreasonably excessive" prices for Propranolol, which is a good "consumed or used to preserve, protect, or sustain life, health, safety, or economic well-being of persons or their property," in the 45 days following a declaration of a state of emergency by the Governor, in violation of North Carolina. Gen..Stat. § 75-38 and § 75-1.1.[92]   The conduct

---

[92] States of Emergency for North Carolina were declared on at least October 29, 2012; March 12, 2013; June 14, 2013; September 12, 2013; January 28, 2014; February 11, 2014; April 28, 2014; July 2, 2014; January 26, 2015; February 16. 2015; February 25, 2015; October 1, 2015; January 20, 2016; and February 17, 2016.

of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina. During the Class Period, Defendants marketed, sold, or distributed generic Propranolol in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers. During the Class Period, each of Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic Propranolol in North Carolina. Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, et seq., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

275.   **North Dakota:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the North Dakota Unlawful Sales or Advertising Practices Statute, N.D. Century Code § 51-15-01, et seq. Defendants agreed to, and did in fact, act in restraint of trade or commerce in North Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Propranolol were sold, distributed, or obtained in North Dakota. Defendants deliberately failed to disclose

material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Propranolol. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Propranolol prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Propranolol, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Propranolol at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of N.D. Century Code § 51-15-01, et seq., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

276.   **South Carolina:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) generic Propranolol prices were raised, fixed,

~~maintained, and stabilized at artificially high levels throughout South Carolina. During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. § 39-5-10, et seq., and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.[93]~~

277. **South Dakota:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the South Dakota Deceptive Trade Practices and Consumer Protection Statute, S.D. Codified Laws § 37-24-1, et seq. Defendants agreed to, and did in fact, act in restraint of trade or commerce in South Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Propranolol were sold, distributed, or obtained in South Dakota. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Propranolol. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Propranolol prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota. Defendants' illegal conduct substantially affected South Dakota commerce and consumers. As a direct and proximate result of Defendants'

---

[93] Plaintiffs acknowledge that this claim was dismissed with prejudice by the Court's February 15, 2019 Order (16-md-2724 Dkt. 858) and reassert the claim here solely for purposes of preservation for appeal.

violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Propranolol, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Propranolol at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Propranolol they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws § 37-24-1, et seq., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

278. **West Virginia:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the West Virginia Consumer Credit and Protection Act, W.Va. Code § 46A-6-101, et seq. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes West Virginia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Propranolol were sold, distributed, or obtained in West Virginia. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Propranolol. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' generic Propranolol prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout West

~~Virginia; (2) generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially~~
~~high levels throughout West Virginia. Defendants' illegal conduct substantially affected West~~
~~Virginia commerce and consumers. As a direct and proximate result of Defendants' violations of~~
~~law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or~~
~~property as a result of Defendants' use or employment of unconscionable and deceptive~~
~~commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive~~
~~conduct, as described herein. Defendants' deception, including their affirmative~~
~~misrepresentations and omissions concerning the price of generic Propranolol, likely misled all~~
~~purchasers acting reasonably under the circumstances to believe that they were purchasing generic~~
~~Propranolol at prices set by a free and fair market. Defendants' affirmative misrepresentations and~~
~~omissions constitute information important to Plaintiffs and members of the Damages Class as~~
~~they related to the cost of generic Propranolol they purchased. Defendants have engaged in unfair~~
~~competition or unfair or deceptive acts or practices in violation of W.Va. Code § 46A-6-101, et~~
~~seq., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under~~
~~that statute.[94]~~

279.  **Wisconsin:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Wisconsin Consumer Protection Statutes, Wisc. Stat. § 100.18, et seq. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Wisconsin, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Propranolol were sold, distributed, or obtained in Wisconsin. Defendants affirmatively misrepresented to all

---

[94] Plaintiffs acknowledge that this claim was dismissed with prejudice by the Court's February 15, 2019 Order (16-md-2724 Dkt. 858) and reassert the claim here solely for purposes of preservation for appeal.

FILED WITH REDACTIONS – PUBLIC VERSION

purchasers during the Class Period that Defendants' generic Propranolol prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin. Defendants' illegal conduct substantially affected Wisconsin commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations concerning the price of generic Propranolol, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Propranolol at prices set by a free and fair market. Defendants' affirmative misrepresentations constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Propranolol they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wisc. Stat. § 100.18, et seq., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

280.   **U.S. Virgin Islands:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the U.S. Virgin Islands Consumer Fraud and Deceptive Business Practices Act, 12A V.I.C. §§ 102, 301-35, et seq.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes U.S.V.I., by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Propranolol were sold, distributed, or obtained in U.S.V.I. Defendants

deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Propranolol. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' generic Propranolol prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Propranolol price competition was restrained, suppressed, and eliminated throughout U.S.V.I.; (2) generic Propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout U.S.V.I.. Defendants' illegal conduct substantially affected U.S.V.I. commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above and are threatened with further injury. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Propranolol, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Propranolol at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Propranolol they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 12A V.I.C. §§ 102, 301-35, et seq., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.

FILED WITH REDACTIONS – PUBLIC VERSION

## FIFTH COUNT

**Unjust Enrichment[95]**
**(on behalf of Plaintiffs and the Damages Class)**

281.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

282.    To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint. This claim is brought under the equity precedents of each of the IRP Damages Jurisdictions. .

283.    Defendants have unlawfully benefited from their sales of generic Propranolol because of the unlawful and inequitable acts alleged in this Complaint. Defendants unlawfully overcharged privately held pharmacies, who purchased generic Propranolol at prices that were more than they would have been but for Defendants' unlawful actions.

284.    Defendants' financial benefits resulting from their unlawful and inequitable acts are traceable to overpayments by Plaintiffs and members of the Damages Class.

285.    Plaintiffs and the Damages Class have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiffs and the Damages Class.

---

[95] Unjust enrichment claims are alleged herein under the laws of Alabama, Alaska, Arizona, Arkansas, California, Colorado, Delaware, Florida, Georgia, Idaho, Illinois, Iowa, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin and Wyoming as well as the District of Columbia, Puerto Rico and the U.S. Virgin Islands.

FILED WITH REDACTIONS – PUBLIC VERSION

286.     Defendants have been enriched by revenue resulting from unlawful overcharges for generic Propranolol while Plaintiffs have been impoverished by the overcharges they paid for generic Propranolol imposed through Defendants' unlawful conduct.  Defendants' enrichment and Plaintiffs' impoverishment are connected.

287.     There is no justification for Defendants' retention of, and enrichment from, the benefits they received, which caused impoverishment to Plaintiffs and the Damages Class, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

288.     Plaintiffs did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.

289.     The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of generic Propranolol.

290.     The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to their unlawful overcharges of generic Propranolol are ascertainable by review of sales records.

291.      Defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from Plaintiffs and the Damages Class with respect to Defendants' sales of generic Propranolol.

292.     It would be futile for Plaintiffs and the Damages Class to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased generic Propranolol, as there is no public evidence that the intermediaries are liable and

so the intermediaries cannot reasonably be expected to compensate Plaintiffs and the Damages Class for Defendants' unlawful conduct.

293.    The economic benefit of overcharges and monopoly profits derived by Defendants through charging supracompetitive and artificially inflated prices for generic Propranolol is a direct and proximate result of Defendants' unlawful practices.

294.    The financial benefits derived by Defendants rightfully belong to Plaintiffs and the Damages Class, because Plaintiffs and the Damages Class paid supracompetitive prices during the Class Period, inuring to the benefit of Defendants.

295.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories of the United States, except Ohio and Indiana, for Defendants to be permitted to retain any of the overcharges for generic Propranolol derived from Defendants' unlawful, unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

296.    Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiffs and the Damages Class.  Defendants consciously accepted the benefits and continue to do so as of the date of this filing, as generic Propranolol prices remain inflated above pre-conspiracy levels.

297.    Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiffs and the Damages Class all unlawful or inequitable proceeds they received from their sales of generic Propranolol.

298.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to indirect purchases of generic Propranolol by Plaintiffs and the Damages Class. Plaintiffs and the Damages Class have no adequate remedy at law.

### XIII.   <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs demand judgment for the following relief:

A.      The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable Notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

B.      That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed: (a) an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act; (b) a per se violation of Section 1 of the Sherman Act; (c) an unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and (d) acts of unjust enrichment by Defendants as set forth herein.

C.      Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed under state and federal laws, and that a judgment in favor of Plaintiffs and members of the Damages Class be entered against Defendants jointly and severally in an amount to be trebled to the extent such laws permit;

D.      Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully obtained;

E.      Plaintiffs and members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment, and the Court establish of a constructive trust consisting of all ill-gotten

FILED WITH REDACTIONS – PUBLIC VERSION

gains from which Plaintiffs and members of the Damages Class may make claims on a pro rata basis;

F.      Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

G.      Plaintiffs and members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate;

H.      Plaintiffs and members of the Classes recover their costs of suit, including reasonable attorney's fees, as provided by law; and

I.      Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

**FILED WITH REDACTIONS – PUBLIC VERSION**

## XIV.    <u>JURY DEMAND</u>

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil

Procedure, of all issues so triable.


Dated: April 1, 2019                                      Respectfully submitted,


                                                         */s/  Jonathan W. Cuneo*

Peter Gil-Montllor                              Jonathan W. Cuneo
Christian Hudson                               Victoria Romanenko
**CUNEO, GILBERT & LADUCA LLP**      **CUNEO, GILBERT & LADUCA LLP**
16 Court Street, Suite 1012                 4725 Wisconsin Ave., NW Suite 200
Brooklyn, NY 11241                         Washington, DC 20016
202-789-3960                                202-789-3960
pgil-montllor@cuneolaw.com                  jonc@cuneolaw.com
                                            *Lead Counsel for the Indirect Reseller Plaintiffs*

**FILED WITH REDACTIONS – PUBLIC VERSION**